THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID LIEBMAN, Appellant.

First Department, April 14, 1992

APPEARANCES OF COUNSEL

*Kevin F. Casey* of counsel *(Philip Weinstein,* attorney), for appellant.

*Nancy D. Killian* of counsel *(Allen H. Saperstein* with her on the brief; *Robert T. Johnson, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

MURPHY, P. J.

The single issue presented is whether the defendant's conviction of murder in the second degree ought to be reduced to one for first degree manslaughter. In support of the reduction sought, the defendant maintains that the evidence adduced at his trial established that when he assaulted his wife inflicting the injuries which caused her death he did so under the influence of extreme emotional disturbance. Under our statutory scheme, of course, a defendant may raise the circumstance of extreme emotional disturbance as an affirmative defense to a murder charge (Penal Law § 125.25) and if the defendant succeeds in establishing the defense by a preponderance of the evidence (Penal Law § 25.00) he is, in view of the mitigating circumstance, entitled to have his conviction for what would otherwise be murder reduced to first degree manslaughter (Penal Law § 125.20 [2]).

On the night of October 16, 1985 police officers responding to a telephone call for emergency assistance made by the victim, Joan Liebman, entered Mrs. Liebman's apartment. There, they found Mrs. Liebman and her husband, the defendant, David Liebman. Mrs. Liebman, although conscious and alert, had been stabbed repeatedly and was bleeding heavily. The defendant, while not himself wounded, was also covered

with blood. He lay unconscious upon the couple's bed. Open prescription bottles were found in the kitchen. The windows to the apartment had been shut and the gas jets in the kitchen turned on. Joan Liebman was taken to the hospital where she died of her wounds the following day. The defendant was also hospitalized, and although he remained comatose for more than two days he eventually revived and was charged with his wife's murder.

The defendant has admitted inflicting the injuries which were found to have caused his wife's death but, as noted, claims to have acted while his capacity for self-control was overborne by extreme emotional disturbance. In support of this contention, the defendant at his nonjury trial called two witnesses, his psychiatrist, Dr. Molly Niv, who last saw him in treatment some nine days before the incident, and Dr. Daniel Schwartz, a court-appointed forensic psychiatrist.

Dr. Niv testified that the defendant and his wife had first consulted her in July of 1983. At that time, the defendant complained of depression, withdrawal, anger and inability to work. He also complained of difficulty sleeping, and of nightmares in which he was chased by his wife; these were described by Dr. Niv as paranoid and persecutory. When asked by Dr. Niv whether he hated his wife, the defendant replied "Joanie hates more." Dr. Niv prescribed sleep medication for both the defendant and his wife.

She next saw the defendant and his wife in early January 1984. At this session Dr. Niv elicited that the defendant had been hyperactive and dyslexic as a child; that as a young man he failed to finish college and that in his adult life he had been unable to hold on to any of the many jobs he had had. At the conclusion of this session, Dr. Niv put the defendant on Sinequan, an antidepressant which also acts as a tranquilizer.

The defendant and his wife returned to Dr. Niv's office at the end of January 1984. The defendant then complained that he was "all nervous" and "afraid of a nervous breakdown." He stated that he was persecuted and that he had been having nightmares. Dr. Niv noted that the defendant would pick at and eat his hands. She continued the defendant on Sinequan.

In May of 1984 the defendant and his wife again consulted Dr. Niv. The defendant complained that everyone was avoiding him and reported that he continued to have nightmares and would wake up screaming during the night. Sleep medication was again prescribed.

The Liebmans' next visit to Dr. Niv occurred in January 1985. Dr. Niv described the defendant at that time as acutely depressed. She noted that he was very anxious and that he told her that he felt panicky. She prescribed 50 milligrams of Thorazine to be taken three times daily for tranquillization. Along with the Thorazine, Dr. Niv prescribed another tranquilizer, Atarax, and sleep medication.

On September 6, 1985 the Liebmans returned to Dr. Niv's office. On this visit the defendant was visibly trembling and seemed to have deteriorated markedly. Dr. Niv stated, "at this point he was not just a person anxious as I have seen him before. He was panicky. He really showed all the signs of a panic paranoia". The couple had just returned from a trip to Israel and Paris. Joan Liebman complained that the trip had not been a success because David had become very paranoid and would not leave the hotel room. It was at this session that the defendant first expressed the fear that he would commit suicide. Dr. Niv, believing that the defendant suffered from a panic disorder, continued him on Thorazine.

On the occasion of the Liebmans' next visit which took place on September 29, 1985, the defendant's condition appeared to have grown still worse. He reiterated that he was afraid he would kill himself. Upon learning for the first time at this session that the defendant had been hospitalized at Creedmoor Psychiatric Center for 1½ years in his early adulthood, Dr. Niv came to believe that the defendant suffered from schizophrenia and placed the defendant on Haldol, a potent medication usually prescribed for the treatment of psychosis. She was quite clear that "the purpose [of the prescription] was to treat [the defendant's] schizophrenic breakdown".

Just two days later the Liebmans were back at Dr. Niv's office. The defendant was extremely anxious and, as Dr. Niv put it, "was eating his hands all bloody." Dr. Niv increased the defendant's dosage of Haldol from 15 to 20 milligrams a day. She was again clear in her testimony that she prescribed the medication to avert, if possible, an exacerbation of what she referred to as the defendant's "smouldering" schizophrenia. She stated, "with the [defendant's] increasing panic I was alerting myself I'm dealing with a schizophrenic process that is why I gave him the Haldol."

After an interval of a mere three days, the Liebmans on October 4, 1985 found it necessary to return to Dr. Niv. At

this session, Dr. Niv noted that the defendant told her of a very bizarre dream he had had. Describing the dream, the defendant had said, "I was in Hawaii and the Queen of Iran slices best friend's back and it was all bloody." Dr. Niv's notes from this session also reflected that Joan Liebman had become very worried that David was on the verge of a breakdown similar to the one he had had as a young man. The defendant's dosage of Haldol was again increased.

The final session before the incident occurred three days later on October 7, 1985. At that time, Dr. Niv found the defendant, although still eating his hands, somewhat improved; he was no longer trembling and seemed more subdued. Dr. Niv, however, stated that she was "very worried." Apparently, Joan Liebman had been physically ill since returning from Israel and had, at one point, been briefly hospitalized. Dr. Niv felt that her illness raised in David's mind the possibility that he would be left alone or abandoned. When asked how he would deal with such a situation, David replied, "I have never grown up." As if to confirm David's extreme dependency, Joan stated, "He's my baby."

The defendant's course of treatment with Dr. Niv was placed in broader perspective by Dr. Schwartz, the court-appointed forensic psychiatric expert. Dr. Schwartz's research into the defendant's psychiatric history revealed that the defendant had had his first psychiatric hospitalization at Kings County Hospital in December 1958 when he was in his early twenties. He remained at the hospital for about two weeks and was discharged with a diagnosis of schizoid personality, unimproved. Eight months later the defendant was brought back to Kings County Hospital by his mother after he had attempted suicide by lacerating his wrists. Following a one-month hospitalization at Kings County Hospital, he was transferred to Creedmoor Psychiatric Center for long-term care. His diagnosis on leaving Kings County Hospital was "schizophrenic reaction, acute, undifferentiated, unimproved." Although the records respecting the specifics of the defendant's treatment at Creedmoor were not available at the time of the trial, Dr. Schwartz was able to ascertain that the defendant received a series of some 15 to 20 shock treatments during his 1½-year stay at the State institution.

The defendant met his future wife, Joan, in 1971 at a resort in the Catskill Mountains. Two years later they began living together in Joan's apartment in Riverdale. Their relationship, however, was not an easy one. The defendant's inability to

hold on to any job and consequent dependence upon Joan's income as a schoolteacher proved a chronic source of tension, and, at one point, the defendant, finding Joan's constant demands upon him intolerable, left her and went to stay with his sister in Florida. Joan, however, repeatedly urged him to return to her and, after the passage of some 18 months, he did so; they were married about one year later, in 1983.

As noted, it was in the summer of 1983 that the defendant and Joan Liebman began the above-described course of treatment with Dr. Niv. Following the couple's last session, which it will be recalled took place on October 7, 1985, the defendant and Joan Liebman argued over an issue which had been an ongoing source of tension between them. The defendant had for some time complained that he was on the verge of a breakdown and had pleaded to be institutionalized in a private psychiatric hospital. While Joan Liebman had expressed the fear in treatment that David might indeed be headed for a nervous breakdown, she remained opposed to the defendant's hospitalization, insisting instead, as she had throughout their relationship, that he find a job and become economically and socially productive. These very sharp differences generated arguments of great intensity which escalated to the point that the defendant on October 9, 1985 was ordered from the household. The defendant then, having no other place to go, flew to Florida to stay with his sister. Before he had even arrived in Florida, however, Joan began calling his sister's home demanding that the defendant return. It is undisputed that these calls became so numerous, averaging some 50 per day, as to make the defendant's continued stay intolerable to his sister, and, after three days in Florida, the defendant cut short his attempts at obtaining private hospitalization in Florida and returned to Riverdale.

At this point in the narrative it should be noted that it was established by stipulation at trial that the defendant had in May 1985 inherited $28,000 from his mother's estate and that this sum was deposited by him in his and Joan's joint bank account. It was further stipulated that during the defendant's three-day absence from the marital household in October 1985, Joan Liebman withdrew $27,168.83 from the couple's joint account and placed it in an account under her exclusive control. Following the transfer, just $52 remained in the joint account.

On his return to Riverdale, the defendant and Joan continued to argue over the defendant's need for private in-patient

psychiatric care. Finally, on the night of October 16, 1985 the argument reached such a pitch that Joan Liebman reportedly told the defendant, "[Y]ou really need help? Take ninety seconals. This will take you out of a lot of problems." At this, the defendant, enraged, repeatedly stabbed his wife with various household implements screaming as he did so, "You hate me." The autopsy report showed that Mrs. Liebman had been stabbed some 51 times. Neither her heart nor her lungs, however, had been penetrated and, as noted, she retained sufficient strength and lucidity to call for emergency assistance. The defendant, on the other hand, took an overdose of Seconals, closed the windows, turned on the gas, and rapidly fell into a coma from which he did not emerge for several days. When the emergency service units entered the apartment, the defendant, who was otherwise inert, was breathing only shallowly and it is clear that but for their timely intervention the defendant's attempt at suicide would have been successful.

The above-recited facts respecting the defendant's psychiatric history and the manner in which the homicide occurred are not disputed. The psychiatric experts differed, however, as to their clinical significance.

Doctor Schwartz was of the opinion that the defendant had suffered from schizophrenia since late adolescence. He attributed the defendant's initial hospitalizations, the second of which was quite lengthy, to acute episodes of that disease. He noted in support of his diagnosis that the defendant, although a reasonably bright man, had led a largely dysfunctional life; he had never finished college, and had been unable to remain at any of the jobs he had held. He was apparently unable to tolerate situations in which even relatively modest demands were placed upon him.

Commenting upon the course of the defendant's treatment with Dr. Niv, Dr. Schwartz advanced the view that the period in which the treatment occurred coincided with a progressive and increasingly rapid deterioration in the defendant's condition culminating in a recurrence of the acute schizophrenia he had suffered as a young man. He noted that, beginning in early 1984, the defendant began to display symptoms of an impending breakdown; he was increasingly upset, plagued by obsessive thoughts, and so anxious that, as Dr. Niv repeatedly observed, he would pick the skin from the back of his hands. Indeed, the defendant's anxiety was so overwhelming that he would find it necessary to stop working in April 1985 and

apparently could do very little, if anything, unless accompanied by his wife.

The defendant was particularly upset and complained repeatedly to Dr. Niv over his sense of his own deterioration; he feared that he was headed for a complete nervous breakdown. Apprehension of an impending breakdown, observed Dr. Schwartz, is not uncommon in schizophrenics. Dr. Schwartz noted that Dr. Niv herself had eventually come to the conclusion that the defendant was suffering from a "smouldering schizophrenia", and expressed the view that it was in an attempt to avoid a lapse into acute psychotic illness that Dr. Niv in early 1985 prescribed Thorazine, an antipsychotic medication, and later that year, after the disastrous trip to Israel and Paris during which the defendant refused to leave his hotel room, prescribed the even more potent antipsychotic agent, Haldol, in progressively larger dosages. The urgency of the defendant's condition by early October 1985, observed Dr. Schwartz, was particularly evident from the unusual frequency of his visits to Dr. Niv; between September 29 and October 7, 1985 the defendant was seen by Dr. Niv on four occasions and on each occasion he was given an increased dosage of antipsychotic medication.

Dr. Schwartz summarized what he understood to be the defendant's perception of his condition by October 1985 as follows:

"he sensed what was happening to him; that he was breaking down; that he was regressing; that he was falling back into that state of schizophrenia that he had experienced all too severely as a youngster and he sensed this happening, that he had no control over it.

"It is like going down a roller coaster, where you have no control over what's happening to yourself and you rightly sense that there is something onerous if it keeps going on."

It was, then, with this sense of impending psychiatric calamity, the sense that he was quite literally losing his mind, that the defendant, according to Dr. Schwartz, sought the assistance of his wife, upon whom he was utterly dependent, both emotionally and financially, in obtaining private in-patient psychiatric care. The dynamic set in motion by the defendant's requests for his wife's assistance was described by Dr. Schwartz in the following manner:

"he [the defendant] was desperate for this psychiatric hospitalization and he was desperate for his wife's demonstration of

her love for him that she would support him in this end; that she would show her love by paying for private psychiatric hospitalization.

"In other words, what he had and what he sensed was a mental breakdown, a nervous breakdown. She may have been a wonderful person. But she didn't have the cure for this. There is nothing she could have done of her own to stop this from coming.

"What she could have done, to demonstrate her love for him, from his point of view, was to put him in a hospital where this mental problem could be treated.

"And when she didn't, for whatever reason, it seemed to him like she was just hating him; that she was rejecting him in the worst possible way."

Plainly, the defendant's apparently long-harboured feelings of being hated and rejected by his wife, would have seemed tragically confirmed by his wife's suggestion at the height of their argument on the night of October 16, 1985 that he could solve his problems by taking 90 Seconals, the equivalent of telling him to "drop dead." And, in fact, as the defendant struck his wife over and over, he is reported to have exclaimed repeatedly, "You hate me."

Doctor Azariah Eshkenazi, the forensic expert retained by the People, while not disputing any of the underlying facts adduced by Doctors Niv and Schwartz, was of a different opinion as to the defendant's diagnosis and the reasons for his conduct on the night of the homicide. Dr. Eshkenazi stated that the defendant was not a schizophrenic. He indicated that he believed from his discussions with the defendant's sister and from the nature of the treatments the defendant received during his Creedmoor hospitalization that the defendant's breakdowns and suicide attempt in the late 1950's were due to depression. He stated that, had the defendant been schizophrenic he would have almost certainly required intermittent rehospitalization in the years following his discharge from Creedmoor, something which had not occurred. His diagnostic impression was that the defendant suffered from "generalized anxiety", a personality disorder and a depressive disorder. The defendant was, in his view, a manipulative and dependent personality. He attributed the defendant's dysfunctionality over the years largely to depression and personality problems and believed that Dr. Niv had prescribed Thorazine and Haldol simply to alleviate the defendant's anxiety; he con-

ceded that these drugs would not be appropriately prescribed for depression and that their most common use was to alleviate or forestall psychosis.

Concerning the events of October 16, 1985, although Dr. Eshkenazi conceded that the defendant was very anxious and seriously depressed, and that his suicide attempt was quite genuine, he believed that the defendant had simply been angry at his wife's refusal to accede to his wishes. He stated, "I do not believe that Mr. Liebman acted under extreme emotional disturbance. Rather, I see it as acting under anger, extreme anger, maybe." Dr. Eshkenazi stressed that the defendant had been aware of what he was doing but stopped short of characterizing him as cold and controlled. He explained, "I * * * said he was a very angry man. Thats all I said. Not cold, and not control *[sic]*. Because he was not controlled, obviously."

As a preliminary matter, the issue before this court is not whether the defendant intended to kill his wife or whether he understood what he was doing when he inflicted the wounds which caused her death. The defense interposed is not that the defendant was legally insane at the time of the crime. Indeed, in seeking no more than a reduction in the degree of his conviction to manslaughter in the first degree, the defendant essentially concedes that he intended to cause his wife's death *(see,* Penal Law § 125.20 [2]; *see also, People v Patterson,* 39 NY2d 288, 302). He maintains, however, that his actions, while lethally intended, were less blameworthy than those of a cold-blooded killer for having been the product of extreme emotional forces over which he had little, if any, control.

Section 125.25 (1) of the Penal Law provides that it is an affirmative defense to a charge of murder in the second degree that "(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." As the language of the statute indicates and caselaw has, in any event, made clear, the defense is composed of two elements. The first of these entails proof that the defendant did in fact act under the influence of extreme emotional disturbance, and the second more objective element, that the disturbance was a reasonable response to circumstances as they were perceived by the defendant, however

irrational his or her perceptions may have been *(People v Casassa,* 49 NY2d 668, 678-679).

There can be no question that the initial component of the defense was established by the present defendant. Indeed, there was no real dispute among the psychiatric experts concerning the depth and intensity of the rage which possessed the defendant as he wildly and repeatedly assaulted his wife. The somewhat more difficult question is whether the defendant's very extreme emotional disturbance was a reasonable response to the situation as he perceived it.

As noted, it was the People's position, articulated at trial by their expert, that the defendant was simply angry that his wife would not give him money and that this anger was ultimately nothing more than an extreme expression of frustration by a manipulative, grasping, lazy and malevolent person. In support of this theory, the People argue at length, in reliance upon Dr. Eshkenazi's testimony, that the defendant was not schizophrenic. The defendant's precise diagnosis, however, hardly seems relevant. Whether or not the defendant was a schizophrenic, it is indisputable upon the trial record that the defendant was a very seriously disturbed person. Indeed, it may be conceded for argument's sake, that the defendant was not a schizophrenic; that, as Dr. Eshkenazi maintained, his early hospitalizations were for depression and that his subsequent inability to function was due to a combination of depression and anxiety. The fact remains, that by the time of the incident giving rise to the instant prosecution, the defendant was so seriously depressed and anxious that he very nearly succeeded in taking his own life. It is additionally undisputed that in the months preceding the tragedy the defendant's psychiatric condition, whether denominated as schizophrenia or some mix of anxiety and depression, worsened steadily to the point that Dr. Niv believed it appropriate to treat him with highly potent neuroleptic medications, and that during this period the defendant, and indeed his wife, repeatedly expressed the fear that he was headed toward a nervous breakdown. In retrospect, there can hardly be any doubt that the defendant's perception of his condition was accurate—that he was, in fact, deteriorating precipitously. Nor, in retrospect, can there be any doubt that the defendant's belief in his need for psychiatric hospitalization was well founded.

Application of the statute governing the availability of the defense of extreme emotional disturbance entails in each case

an understanding of the situation as it would have been perceived, not by a perfectly sensible individual but by the particular defendant at bar *(see, People v Casassa, supra,* at 679).* Here, it is clear from the record of Dr. Niv's contemporaneous observations of the defendant that he not only felt himself to be regressing, but that he was, in fact, doing so at, what had become by October 1985, an alarming rate. Given his perception of his condition—his sense that his sanity hung by a slender thread—it was entirely reasonable that the defendant should have wished to obtain the best treatment available. Perhaps due to his lengthy experience in city and State psychiatric facilities in the late 1950's, he was intent upon being treated at a private facility and, in fact, had expressed interest in being admitted to one of two such facilities, both of which had excellent reputations. The defendant, it will be recalled, had inherited a substantial sum of money from his mother, and doubtless felt entitled to use some of it to preserve his sanity. When his wife, upon whom the defendant depended financially and emotionally, not only refused to acknowledge the defendant's psychiatric need, but actually took affirmative steps during the defendant's absence in Florida to prevent him from gaining access to funds he had inherited and which he needed to obtain the help he sought, anger by the defendant, indeed intense anger, was a reasonable response. And, when, during their final argument, the defendant, according to the account accepted by both defense and prosecution experts, was told in response to his pleas for help that the solution to his problems was to take 90 Seconals, or in other words, to commit suicide, the defendant's rage was both predictable and understandable. Indeed, it would be a rare person who would not react with extreme anger and despair to the apparently hateful response of a spouse to a plea for help in dealing with a psychiatric crisis.

It should be stressed that the issue in this case is not whether the defendant's act of killing his wife was a reasonable response under the circumstances for, clearly, it was not. Rather, the issue is the reasonableness of the explanation offered for the defendant's extreme emotional reaction *(see, People v Casassa, supra,* at 679, n 2).* On this record, it is all but impossible to conclude that the defendant's emotional response to the situation as he perceived it was without reasonable explanation.

In reaching this conclusion we do not unduly encroach upon the trier of fact's function. No issue has been raised as to the

demeanor and basic credibility of the expert witnesses who testified at the defendant's trial; all were highly qualified and thoroughly professional in their testimony. Moreover, we are presented with a situation in which the basic facts are undisputed and, in large part, the difference in psychiatric opinion was without legal relevance; for, whatever the defendant's precise diagnosis, it was clear beyond argument that he was a deeply disturbed person with good reason to fear, as he did, that his disease might have tragic consequences. The relevant difference in the psychiatric testimony is thus reduced to two opinions as to the reasonableness of the explanation for the defendant's emotional disturbance on the night of October 16, 1985. And, in choosing between these opinions, it cannot be said that the trial court sitting as the trier of fact possessed any special advantage to which this Court is bound to defer. As has been observed, "[c]hoice between opposing opinions is dictated by appraisal of the relative weight of conflicting considerations, and a trial court is in little better position than the appellate court to make the appraisal" *(People ex rel. MacCracken v Miller,* 291 NY 55, 63).

As we understand it, it was the view of the expert retained by the People that the dispute between the defendant and his wife which had its tragic denouement on October 16, 1985, was, in the final analysis, nothing more than a routine dispute between a husband and wife over money. As Dr. Eshkenazi stated, when asked on cross-examination whether the defendant had not been under unusual stress,

"I fail to see that extremely unusual stress, sir. I know there [were] arguments between him and his wife. I know he wanted money from her. I know he was depressed. I know he was anxious.

"Argument with your wife over money is not an extremely unusual stress."

Although it might be possible to conclude, based on Dr. Eshkenazi's testimony, that the defendant was simply being manipulative in an attempt to obtain money, this is not a view which accords with the weight of the evidence. The record before us is replete with undisputed evidence that the defendant, after having had psychiatric difficulties as a child, spent substantial periods of his early adulthood in city and State psychiatric facilities, and that he was subsequently unable to function successfully in any area. In addition, the observations of the defendant's treating psychiatrist during

the 21-month period preceding the incident, disclosed a profoundly disturbed individual, plagued by obsessive thoughts, nightmares and sleeplessness; one who, toward the end of this period, was so anxious as to visibly tremble and bite the skin off of his hands. It is further undisputed that the defendant complained in treatment of feeling depressed and suicidal and that both he and Mrs. Liebman were fearful that he was regressing toward a complete breakdown. Nor is there any issue that the defendant's symptoms were considered so serious that he was placed on significant and, particularly in the week and a half prior to the tragedy, rapidly increased dosages of a medication prescribed primarily to avert or treat psychosis. It was in this context, then, that the defendant, conceded by the prosecution's witness to have been seriously depressed and anxious, pleaded with his wife, not simply for money, but for money he desperately believed necessary to obtain the sort of psychiatric care he felt he needed. Indeed, the defendant's sense of entitlement to this money was born not only of his feeling of urgent psychiatric need, but from the circumstance, established by stipulation, that this was money which had been bequeathed him by his mother who had in the past looked after him, and, on at least one occasion, hospitalized him when he had been ill. Respectfully, this cannot be viewed as a mere garden-variety marital dispute over money. As the defendant perceived the situation, his sanity hung in the balance and he was not only being refused assistance by his wife, who had in his absence assumed control over money he had inherited, but, in the end, was told that he ought to commit suicide, advice that in his very depressed and impulsive state he nearly succeeded in following.

On reviewing the record, then, and discharging our duty in a case of this nature, to, "like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (People v Bleakley, 69 NY2d 490, 495, quoting People ex rel. MacCracken v Miller, 291 NY 55, 62, supra), we are of the opinion that the evidence supporting the defendant's claim of extreme emotional disturbance was not only preponderant but absolutely overwhelming and that the trial court's verdict convicting the defendant of murder in the second degree was against the weight of the evidence.

Accordingly, the judgment of the Supreme Court, Bronx County (Vincent A. Vitale, J.), rendered on June 3, 1988, after a nonjury trial, convicting the defendant of murder in the

second degree and four counts of criminal possession of a weapon in the fourth degree, and sentencing the defendant to an indeterminate prison term of 17 years to life on the murder count and four one-year terms on the possessory counts, all to run concurrently, should be modified, on the law and the facts, the conviction for murder in the second degree reduced to one for manslaughter in the first degree and the matter remanded for resentencing, and otherwise affirmed.

KUPFERMAN J. (dissenting). One need not fault the sensitive analysis in the Court's opinion to differ with its conclusion.

The defendant was obviously a seriously disturbed person. However, if one goes through life under extreme emotional disturbance (the norm), how does the trier of fact distinguish between such normal (abnormal) behavior and that necessary to sustain the affirmative defense?

A neighbor heard the victim scream, "You're killing me." Responding police officers heard a woman's voice saying, "Murder. Help me. Help, Murder." She made a dying declaration that her husband "did this to me."

Can the excuse for murder presented to the jury as delineated in the majority opinion be considered reasonable on an objective basis? *(People v Casassa,* 49 NY2d 668, 675, *cert denied* 449 US 842.)

The test is both subjective and objective *(cf., People v Goetz,* 68 NY2d 96).

Determinations of a witness's credibility are matters for the trier of fact, who can reject expert opinion with respect to whether a defendant acted under extreme emotional disturbance *(see, People v Grinan,* 161 AD2d 325). We cannot conclude that the court below, sitting as a trier of fact, erred in rejecting defendant's experts and in deciding that defendant failed to meet his burden of establishing by a preponderance of the evidence that he had acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse (Penal Law § 125.25 [1] [a]; *see generally, People v Casassa, supra).*

Accordingly, the judgment, Supreme Court, Bronx County (Vincent A. Vitale, J.), rendered June 3, 1988, convicting defendant after a nonjury trial of murder in the second degree and four counts of criminal possession of a weapon in the fourth degree, and sentencing him to concurrent terms of 17 years to life, and four definite terms of one year, should be affirmed.

MILONAS and RUBIN, JJ., concur with MURPHY, P. J.; KUP-FERMAN, J., dissents in a separate opinion.

Judgment of the Supreme Court, Bronx County, rendered on June 3, 1988, after a nonjury trial, convicting the defendant of murder in the second degree and four counts of criminal possession of a weapon in the fourth degree, and sentencing the defendant to an indeterminate prison term of 17 years to life on the murder count and four one-year terms on the possessory counts, all to run concurrently, is modified, on the law and the facts, the conviction for murder in the second degree reduced to one for manslaughter in the first degree and the matter remanded for resentencing, and otherwise affirmed.