OPINION OF THE COURT
Cohen, J.
During the early morning hours of March 22, 2008, the defendant beat his girlfriend to death with a baseball bat inside the home they shared in Croton-on-Hudson, New York. At trial, the defendant relied on the affirmative defense of extreme emotional disturbance, presenting evidence that he had a long history of psychiatric illness, and that in the months leading up to the homicide, his mental state deteriorated as his once successful business faced financial setbacks, and anxiety kept him from sleep. The defendant was also experiencing a great deal of *77 stress over the prospect of hosting a large family dinner for the upcoming Easter holiday, and he claims that he reached his breaking point and lost control of his actions when his girlfriend rebuffed his suggestion that they cancel the planned gathering. There is no indication that the defendant had ever committed any prior acts of violence against his girlfriend, and his girlfriend’s teenaged daughter testified that the defendant and her mother loved each other and were discussing marriage. At the conclusion of the trial, the jury rejected the proffered extreme emotional disturbance defense, and convicted the defendant of murder in the second degree. The defendant appeals, arguing that the jury’s failure to accept his defense of extreme emotional disturbance in mitigation of his conduct in killing his girlfriend, and accordingly reduce the degree of his conviction to manslaughter in the first degree, was against the weight of the evidence.
For the reasons that follow, we conclude that the defendant sustained his burden of proving, by a preponderance of the evidence, that he was acting “under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse” (Penal Law §§ 125.27 [2] [a]; 125.25 [1] [a]) when he killed his girlfriend, and that the jury’s failure to reduce the degree of his conviction to manslaughter in the first degree was against the weight of the evidence.
During the course of the jury trial conducted in the spring of 2009, the defendant presented extensive evidence of his background, his history of treatment for depression and anxiety, and his mental state prior to and at the time of the homicide through his own testimony, the testimony of his treating psychiatrist, and the testimony of several family members. According to the accounts of the defendant’s background given at trial, he took his first steps toward becoming a successful entrepreneur as a young man. In May 1976, when the defendant was just 21 years old, he started his own business, selling health products in a local gymnasium in the Bronx. After making a modest sum of money, he opened a small health food store. In 1978, the defendant married, and he and his wife had three children. Eventually, the defendant sold his health food store and started a health products distribution business in the Bronx. As the business grew more successful, the defendant moved the company to a larger facility and increased the product line. During the early 1980s, the company’s distribution and sales increased to about $500,000 a year, and at its peak, in the late 1980s and early 1990s, the company grossed approximately $1.5 million annually.
*78 In 1993, 15 years before the tragic incident, the defendant began weekly psychotherapy sessions with a psychiatrist. His treating psychiatrist testified that the defendant presented with a history of depression and a long history of anxiety and panic disorder that would manifest itself in panic attacks, an extreme form of anxiety during which the patient experiences an inability to breathe and heart palpitations. Although the defendant initially wanted to avoid taking medication for his mental health problems, he eventually agreed to take an antidepressant prescribed by the psychiatrist. The psychiatrist testified that the defendant was “insecure” and that his defense against “massive insecurity” was to be “perfect,” which made it hard to ever admit that he was wrong.
By 2003, the defendant and his wife were “separated,” but still living in the same house. The defendant met Jeanette Carlucci, the victim, online in May 2003, and they eventually started dating. In April 2005, the defendant and Carlucci took a seven-month “hiatus” from their relationship. During that period, the defendant’s wife moved out of the marital home. The defendant’s relationship with Carlucci then progressed, and they started talking about marriage and even placed a deposit on an engagement ring. Carlucci’s teenaged daughter, who split her time between her mother’s home and her biological father’s home, never saw her mother and the defendant fight, and believed that her mother and the defendant loved each other.
The defendant’s business suffered a downturn in 2006, when two raw ingredients used in two of his best-selling products started to increase in cost. The defendant did not raise prices, hoping the cost would go back down. As a result, the defendant’s business began to have cash flow problems.
The defendant’s divorce from his wife was finalized in August 2007. Later that year, in October 2007, Carlucci woke the defendant up from a nap because he was gasping for air. The defendant noticed that his heart was racing. After engaging in research on the internet, the defendant diagnosed himself as suffering from sleep apnea.
In the months leading up to Carlucci’s death, the defendant faced additional pressure stemming from business difficulties, and continued to experience problems with sleeping. During this period, his mental health also markedly deteriorated. In December 2007, the possibility of a potential lawsuit against the defendant and his company was looming. The defendant had conversations with the principal of the other company involved *79 about a possible settlement, but the claim eventually led to litigation. Somehow, the defendant became convinced that the principal of the plaintiff company was involved in organized crime, and he became “fixated” on the idea that his earlier conversations with the principal had been tape-recorded. The defendant became highly distressed about the litigation. At a Christmas party later that month, the defendant talked to many people, including his sister and brother-in-law, both physicians, about his lack of sleep.
Shortly thereafter, in January 2008, Carlucci moved into the defendant’s house in Croton-on-Hudson. However, the defendant slept in the master bedroom upstairs, and Carlucci slept in a separate bedroom downstairs, because they were not married and wanted “to set a good example” for their children. At about this same time, the defendant began seeing his psychiatrist twice weekly due to his increased anxiety, including his fear that he would choke and die in his sleep. He was also anxious due to the pending litigation and because his cash flow was poor. The defendant’s psychiatrist believed that his sleeping difficulties were the result of panic attacks and adjusted the defendant’s medication. Although the psychiatrist noted that sleep disturbance was “one of the cardinal symptoms of depression,” he nevertheless referred the defendant to another doctor for a sleep evaluation. According to the defendant, the doctor he was referred to did not believe that he suffered from sleep apnea, but wanted to conduct a sleep study to be certain. However, the defendant injured his back while lifting weights on January 7, 2008, and could not participate in the sleep study because he was unable to lie on his back.
The defendant’s adult children noticed changes in his behavior during the early part of 2008. The defendant’s son, who worked with the defendant at the company, noticed a decline in both the amount of work the defendant was performing for the company, and the quality of the work performed. The son also noticed that the defendant was depressed, often tired, was having sleeping problems, and was “obsessed” about the lawsuit. The defendant’s daughter noticed that her father was more tired and emotional than usual. The defendant would cry and tell her that he loved her.
The defendant testified that in February 2008, he was still having trouble sleeping and was still concerned that the principal of the plaintiff company in the lawsuit was involved in organized crime. Despite the fact that Carlucci had moved in *80 with him, he also approached his now former wife and asked her to take him back.
The defendant’s downward spiral continued throughout the month of February 2008. On February 29, 2008, the defendant was very distressed, and he called his sister and expressed to her that he could not “take this anymore, . . . the anxiety is intolerable. I can’t think, I can’t sleep, I can’t do anything. I am in bed most of the time . . . please help me.” Following this call, the defendant met with his sister, and told her about his anxiety, depression, obsession about organized crime invading his business concerns, money problems, and medication.
The next morning, March 1, 2008, approximately three weeks before the homicide, Carlucci, the defendant’s sister, and the defendant’s brother-in-law took the defendant to the Westchester Medical Center’s psychiatric emergency center. He was admitted and spent the night, sleeping five straight hours, but insisted on going home the next day. He continued to attend sessions with his psychiatrist. The defendant would talk to his sister two or three times a day.
On March 7, 2008, the defendant advised the attorney representing him in the litigation by fax to “Please end this, we pay them” and “Thank you so very, very much, I owe you the world, God bless you.” The faxed note also said,
“I must end this case since I have had health problems since October and as discussed with my physician, this is a big contributor to my health problems . . . Once you settle it, it will take the weight of the world off my shoulders and let me rest and sleep better and come back to life.”
Although the attorney settled the case, the defendant remained anxious about making the settlement payments.
Shortly thereafter, approximately one week before Easter, Carlucci raised the idea of hosting Easter dinner that year. Carlucci’s daughter suggested that “both sides of the family” be invited to the gathering, which would be unusual, as “it was only always the Sepes.” While initially hesitant, telling Carlucci he would prefer to go to his mother’s house so he “wouldn’t have to do anything at all,” the defendant “got on board” because he “didn’t want to disappoint” Carlucci, as she wanted to have her family over and he “hadn’t been doing so many things.” Thus, the defendant and Carlucci started to plan an Easter dinner for about 20 people. They decided to order food from a restaurant. Although the defendant usually did the ordering, Carlucci ordered the food for the planned gathering *81 because the defendant could not figure out how much to get. As the holiday approached, Carlucci began making all the preparations, including “cleaning the whole house,” because the defendant “wasn’t able to help her.”
The defendant’s anxiety about hosting the Easter dinner increased. However, the defendant continued to express excitement to his children and sister about hosting the dinner, while simultaneously feeling that if he canceled the party, he would disappoint Carlucci. The defendant testified that during this time, he “felt like [he] was just losing everyone.” The defendant told his psychiatrist about his Easter plans and his feeling that he was “totally incapable of relating to people,” and that it was causing him a “lot of stress.” The psychiatrist suggested to the defendant that he cancel the Easter plans if he did not feel up to it. Even so, the psychiatrist thought that the defendant was “slightly better” and had “increased energy.” The defendant testified that the next day, he discussed canceling the party with Carlucci. He explained that he was not only “worked up about the Easter dinner,” but also “about everything; about the Mafia, about money, about so many different things. I am losing myself. Where is my personality? I felt like I was . . . losing [Carlucci], my children,” but he didn’t want to disappoint Carlucci.
On Good Friday, March 21, 2008, the defendant called his sons to remind them about Easter dinner and also to discuss business. One of the sons testified that this was “one of the better days” for his father.
The defendant himself felt “a little bit better,” that day, but experienced anxiety after some “light exercise.” He and Carlucci decided to stay in for the night. At about 10:00 p.m., Carlucci got into her pajamas, and they laid down in her bed in her downstairs bedroom. The defendant fell asleep for a short while, but woke up when Carlucci’s phone rang. At that point, he went upstairs to his bedroom and fell asleep.
Describing his actions immediately before and after the homicide, the defendant testified that he was woken from his sleep by a noise in the house. He grabbed the bat he kept under his bed for protection and went downstairs to look around. Certain that there were no intruders in the house, the defendant put down the bat and started pacing in the kitchen. He paced for “a couple of hours maybe, an hour and a half.” He was “worked up” over hosting Easter dinner, the settlement of the lawsuit, and money.
At some point, Carlucci called out from her bedroom, “[W]hat are you doing.” He went into the bedroom, with the bat, and *82 said, “I think we have to cancel the party.” Carlucci replied, “in a normal tone,” “are you crazy?” The defendant yelled, “[W]e can’t do this anymore, I can’t do this anymore, I can’t do it anymore.” It was then that he started hitting Carlucci with the bat. Carlucci jumped off the bed and ran out of the room. She said, “Robert, it’s me.” The defendant ran after her, then followed her back into the bedroom, where he hit her again.
The defendant’s violent assault upon Carlucci is undisputed. Evidence presented by the People established that Carlucci’s face, hands, left elbow, right forearm, right buttocks, left knee, and both feet bore evidence of blunt force trauma consistent with being struck multiple times by an aluminum baseball bat. The middle finger of her left hand was fractured and the tip of the finger was missing. One of the blows had been “severe enough to cut the fingertip off.” The upper left arm area had “grab marks,” and there were injuries to her palms which indicated that Carlucci had tried to defend herself. These injuries were sustained while Carlucci was still alive.
Carlucci had sustained a minimum of four blows to the skull consistent with being struck by an aluminum bat with “tremendous force.” There were four lacerations to the back of the head, the “entire skull” was fractured, and the brain matter was eviscerated. There was no brain tissue left in the skull. She also sustained a broken nose, fractured jaw, multiple lacerations to her forehead, ears, and eyelids, and abrasions to her cheeks, chin, and mouth. These injuries were consistent with “bone matter from being struck in the back of the head” and with being struck while face down on the bedroom floor.
The testimony of the People’s blood spatter expert confirmed that the attack began in Carlucci’s bedroom, continued down the hall into the laundry room and bathroom, and then back into the bedroom. There were clumps of hair in the hallway and the bedroom. The bat found next to Carlucci was dented and covered in blood, and the blood spatter was consistent with her having been struck by the bat many times while being pursued. Aside from one bloody dent in the hallway wall, nothing was broken or out of place in the hallway, bathroom, laundry room, or bedroom.
After the attack, the defendant stood over Carlucci’s body for a long time, “[t]hen [he] wanted to kill himself.” He searched the term “jugular vein” on the internet and grabbed a knife, intending to cut his throat, but he could not go through with it. He put plastic bags over his head to suffocate himself, but it did *83 not work. He thought about dropping a weightlifting weight on his neck, but he was not sure it would be fatal. The defendant then went into the kitchen and put his bloody socks and shirt in the garbage can “and buried them down.” He urinated into the garbage can and, because he was worried about priapism as a side effect of his medication, he masturbated into the garbage can. He got a drink from the refrigerator and took some pills.
The defendant put on a clean sweatshirt and left the house with a knife and $2,300 in cash. He started driving toward his time share property in upstate New York. One of the things he “was thinking of tremendously” was that his children would get to the house and see what had happened, but he did not turn the car around; rather, he threw his cell phone out the window.
After about three hours of driving, he got out of the car at an overpass. He stood on the overpass for a couple of hours, still contemplating suicide, before New York State Troopers arrived. He “wanted time to stand still,” so he told the police that he was from the Bronx and had hitchhiked there. He talked to the Troopers about Italian food, the Bronx, weightlifting, and vitamins. He never mentioned Carlucci.
When asked “why [he] did what [he] did” to Carlucci, the defendant testified:
“The pressure of the party, I couldn’t live anymore. It was an irrational, impossible event. The party was looming on my mind: How am I going to deal with these people, how am I going to handle all these people, I can’t do it. As I am pacing back and forth, I am thinking of all my problems, all my stuff, and it’s ridiculous.
“I just lost — I don’t know, I don’t know how to explain it. I lost control. I don’t know how to explain it. It’s just so, so, so surreal. Anyone that knows me, anyone that knows me — it haunts me every single day. I don’t understand it. I don’t understand it.
“It’s just — I couldn’t do this party, I couldn’t do it. It was a party. Under normal circumstances, I could do 50 parties. I just couldn’t talk to one person at that time, how am I going to talk to all these people? How am I going to do it? I am going to die. I can’t do it, I will die. I can’t, it’s impossible.”
*84 The Testimony of the Psychiatric Experts
Both the defendant and the People offered the testimony of psychiatric experts at trial. The psychiatric experts differed as to the clinical significance of the defendant’s psychiatric background and the defendant’s actions during and immediately after the homicide.
The defendant’s expert, Dr. Alan Tuckman, confirmed that the defendant’s psychiatric history revealed that he had been treated for depression and anxiety for many years. Four to six months before the murder, the defendant’s condition began deteriorating, and he became more and more depressed and anxious, withdrawn, obsessed that he would die from sleep apnea, and obsessed that there was an organized crime component to the lawsuit that had been brought against him and his company. Tuckman opined that the defendant was suffering from extreme emotional disturbance when he killed Carlucci. Tuckman testified that the defendant had no violent history but had serious psychiatric problems which weakened him, and that as the defendant became weaker emotionally and sicker, he felt guilty about divorcing his first wife, the mother of his children, and became unable to function. Tuckman opined that the defendant’s emotionally weakened state probably triggered his explosion when Carlucci suggested that they could not cancel the Easter Sunday party.
Tuckman testified that the fact that after the homicide, the defendant went through the house, contemplating various ways to commit suicide, meant “nothing.” “People after a murder do either obsessional things or disorganized things.” The extreme emotional disturbance occurs at the time of the crime; what somebody does afterwards does not have any bearing on the crime. Tuckman also testified:
“[W]hat I have seen most of the time is people racing around afterwards going, oh, my God, oh, my God, oh, my God, oh, my God. That’s what I have mostly seen. Oh, my God, what did I do, what happened, what did I do. They are no[w] exhausted with the adrenalin gone and just sitting down slumped.”
According to Tuckman, a reflection of remorse for commission of the crime accompanies extreme emotional disturbance, and he believed that the defendant felt intense remorse. The defendant expressed his remorse by saying that the murder was an “impossible event.” In Tuckman’s opinion, remorse and denial were “the same thing.”
*85 Tuckman acknowledged that the defendant “was lying” when he told the New York State Troopers that he had hitchhiked to the overpass. However, by that point the defendant was not under the influence of an extreme emotional disturbance.
In contrast, the People’s expert, Dr. Angela Hegarty, found that the defendant’s actions during and after the murder did not evince a loss of control. Opining that the defendant’s mental state was “highly consistent with an anxiety disorder and highly consistent with a severe personality disorder, narcis[sis]tic personality disorder,” Hegarty testified that there was no evidence of mania or psychosis. While the defendant was being treated for anxiety and panic, Hegarty concluded that at the time of the crime, the defendant was not suffering the effects of an extreme emotional disturbance to such extent that it would serve as a reasonable explanation or excuse for his crime. According to Hegarty, at the time of the crime, the defendant appreciated the nature and consequences of his actions and knew that his conduct was wrong.
As noted, at the conclusion of the trial, the jury rejected the defendant’s extreme emotional disturbance defense, and convicted him of murder in the second degree.
Analysis
At the outset, we note that the trial court, in addition to charging murder in the second degree, properly charged the affirmative defense of extreme emotional disturbance, affording the jury the option of returning a verdict of manslaughter in the first degree instead of murder (see People v McKenzie, 19 NY3d 463 [2012]). We further note that the defendant does not challenge the legal sufficiency of the evidence presented at trial (see CPL 470.05). Rather, by seeking only to reduce his conviction from murder in the second degree to manslaughter in the first degree, he essentially concedes that he intended to cause Carlucci’s death. However, he takes the position that his deadly actions, while intended, were less culpable because they were the product of an extreme emotional disturbance, and that the jury’s failure to accept his defense in mitigation of his conduct in killing Carlucci was against the weight of the evidence (see Penal Law §§ 125.25 [1] [a]; 125.20 [2]).
We begin our analysis by examining the nature and scope of the affirmative defense of extreme emotional disturbance. Penal Law §§ 125.25 (1) (a) and 125.20 (2), “[r]ead in tandem,” together “provide that a defendant who proves by a preponderance of the evidence that he or she committed a homicide while *86 ‘under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse’ is guilty of manslaughter and not murder” (People v Roche, 98 NY2d 70, 75 [2002] [internal quotation marks omitted]). The defense of extreme emotional disturbance does not negate intent (see Penal Law § 125.20 [2]; see also People v Gonzalez, 1 NY3d 464, 469 [2004]; People v Patterson, 39 NY2d 288, 302 [1976]; People v Liebman, 179 AD2d 245 [1992]). Instead, the “defense allows a defendant charged with the commission of acts which would otherwise constitute murder to demonstrate the existence of mitigating factors which indicate that, although . . . not free from responsibility for [the] crime, [defendant] ought to be punished less severely” (People v Roche, 98 NY2d at 75 [internal quotation marks omitted], quoting People v Casassa, 49 NY2d 668, 675 [1980], cert denied 449 US 842 [1980]). Although the defense of extreme emotional disturbance is “an outgrowth of the ‘heat of passion’ doctrine which had for some time been recognized by New York as a distinguishing factor between the crimes of manslaughter and murder,” the defense is broader than the “heat of passion” doctrine, and was intended to apply to a “wider range of circumstances” (People v Casassa, 49 NY2d at 675-676, 679-680).
The defense of extreme emotional disturbance comprises two elements. The first element is “wholly subjective” and “involves a determination that the particular defendant did in fact act under extreme emotional disturbance, that the claimed explanation as to the cause of his action is not contrived or sham” (id. at 678-679). The subjective element “focuses on the defendant’s state of mind at the time of the crime and requires sufficient evidence that the defendant’s conduct was actually influenced by an extreme emotional disturbance” (People v Harris, 95 NY2d 316, 319 [2000]). The subjective element is generally associated with a loss of self-control (see id. at 319). The second element, which the Court of Appeals has acknowledged to be “more difficult to describe,” requires that an objective determination be made as to whether there was a reasonable explanation or excuse for the emotional disturbance (People v Casassa, 49 NY2d at 679; see People v Harris, 95 NY2d at 319). “Whether such a reasonable explanation or excuse exists must be determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, ‘however inaccurate that perception may have been’ ” (People v Harris, 95 NY2d at 319 [emphasis added], *87 quoting People v Casassa, 49 NY2d at 679; see People v Cass, 18 NY3d 553, 561 [2012]).
An appellate court has authority to set aside a verdict as against the weight of the evidence, but it must do so only when, after examining all of the credible evidence, it finds that a different verdict would not have been unreasonable (see People v Danielson, 9 NY3d 342, 348 [2007]). Upon such a finding, it must then weigh “the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony” and decide whether “the trier of fact has failed to give the evidence the weight it should be accorded” (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks omitted]; see People v Romero, 7 NY3d 633, 644-645 [2006]). Based on the weight of the credible evidence, this Court then must decide whether the jury was justified in rejecting the extreme emotional disturbance defense (see People v Danielson, 9 NY3d at 348; People v Bleakley, 69 NY2d 490 [1987]; People v Bornhoeft, 53 AD3d 666 [2008]). We accord great deference to the jury’s opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383, 410 [2004], cert denied 542 US 946 [2004]; People v Bleakley, 69 NY2d at 495). However, “[essentially, the court sits as a thirteenth juror and decides which facts were proven at trial” (People v Danielson, 9 NY3d at 348-349).
In our view, a different verdict would not have been unreasonable in this case. Accordingly, we must proceed to weigh the evidence presented at trial, and determine whether the jury gave the evidence the weight it should be accorded. A conscientious discharge of this duty compels us to conclude that the jury verdict convicting the defendant of murder in the second degree, thus rejecting his extreme emotional disturbance defense, was against the weight of the evidence (see CPL 470.15 [5]; People v Romero, 7 NY3d at 644-645; People v Haney, 85 AD3d 816, 818 [2011]; People v Pickens, 60 AD3d 699, 702 [2009]). Indeed, we find that the evidence supporting the defendant’s claim of extreme emotional disturbance was overwhelmingly preponderant (see Penal Law § 25.00 [2]; People v Bleakley, 69 NY2d at 495; People v Liebman, 179 AD2d 245, 258 [1992]).
As our dissenting colleagues do, we approach the proffered extreme emotional disturbance defense by examining both of its elements: the subjective, wherein a determination must be made as to whether the defendant suffered from a lesser form of “mental infirmity” than “insanity,” typically manifested by a *88 loss of self-control (People v Roche, 98 NY2d at 75; People v Harris, 95 NY2d at 319), and then the objective, when we determine whether the defendant’s emotional disturbance was supported by a reasonable explanation by assessing the defendant’s conduct from his viewpoint under the circumstances as the defendant perceived them to be (see People v Casassa, 49 NY2d at 678-679).
With respect to the subjective element, the evidence overwhelmingly demonstrates that the defendant, who was in a fragile mental state, was actually influenced by an extreme emotional disturbance when he attacked Carlucci, with whom he had previously shared a loving relationship. The defendant’s assault upon Carlucci was unquestionably brutal, with the defendant striking her repeatedly with an aluminum baseball bat to a point beyond redundancy. Indeed, Westchester County Medical Examiner Kunjlata Ashar testified that Carlucci was struck a minimum of 18 times, with enough force to cut her fingertip off, fracture her entire skull, and leave her brain matter entirely eviscerated from her skull. Most of her injuries occurred as the defendant continued to strike her while she was already on the ground. In our opinion, as described by the forensic experts, the attack was nothing short of a barbaric frenzy, and thus indicative of the defendant’s loss of self-control.
We are mindful of the fact that the brutal nature of the attack does not itself prove, with nothing more, that the defendant acted under an extreme emotional disturbance. Indeed, in concluding that a defendant was not entitled to a jury charge on the affirmative defense of extreme emotional disturbance in People v Roche, the Court of Appeals cautioned that “violence and brutality are not necessarily indicative of a loss of self-control or similar mental infirmity, nor is brutality generally more deserving of mercy” (People v Roche, 98 NY2d at 77-78). However, in Roche, the sole evidentiary predicate for the defendant’s requested charge on the defense of extreme emotional disturbance was the sheer brutality of the attack (see id. at 75; see also People v McKenzie, 19 NY3d 463 [2012]). In contrast, in People v McKenzie (19 NY3d 463 [2012]), the Court of Appeals concluded that it was error to fail to instruct the jury on the defense where, among other things, “the sheer number and redundancy of the knife wounds” the defendant inflicted on the victim was indicative of his loss of control (id. at 467). In McKenzie, “the evidentiary predicate for the defense was augmented by inculpatory admissions to third parties, including *89 the police, in which defendant stated that he had ‘snapped’ ” and there “were also reports of defendant’s appearance and demeanor consistent with his having been affectively disturbed in the assault’s near aftermath” (id. at 467-468, citing People v Moye, 66 NY2d 887, 888-890 [1985]).
The defendant’s conduct in the aftermath of the homicide supports the conclusion that he was overtaken by an extreme emotional disturbance when he attacked CarluccL As in McKenzie, the defendant made no real effort to conceal his actions, leaving the murder weapon beside Carlucci’s body, and leaving physical evidence connecting him to the crime throughout the house. The defendant made no effort to evade capture. While he started driving to his upstate time share property, a place where he could easily be found, after a few hours he stopped his car and stood at an overpass until New York State Troopers arrived. He truthfully identified himself to the Troopers and gave his true address, a location where Carlucci’s body, so brutally slain, would be found. While the defendant did not immediately disclose to the Troopers the circumstances that brought him to the overpass, he made comments that implied there was much more to his story and a willingness to confess. One of the Troopers concluded that the defendant was “mentally disordered,” i.e., somebody who would have intent to harm themselves, an emotionally disturbed person. The defendant exhibited extreme remorse, albeit in a manner that was consistent with his own coping skills.
The evidence further established that the defendant suffered from “significant mental trauma,” i.e., a condition that manifested in depression and anxiety for which he had been treated for many years, but which in the six months immediately preceding the attack had caused the defendant’s condition to deteriorate. During that six-month period, he became even more depressed and anxious, withdrawn, obsessed, sleep-deprived, and paranoid. This was mental trauma which affected the “defendant’s mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore” (People v Patterson, 39 NY2d 288, 303 [1976]). Subjectively, he was under the influence of an extreme emotional disturbance at the time of the homicide.
Turning to the objective element of the defense, we find that the evidence further supports a finding that, from the defendant’s perspective, there was a reasonable explanation for the emotional disturbance. While it is difficult to stand in the *90 defendant’s shoes, and understand his actions at the time of the homicide, what made him “snap,” and even his actions immediately after, it is the factfinder’s obligation to assess the reasonableness of the extreme emotional disturbance from “the viewpoint of a person in the defendant’s situation under the circumstances as the defendant believed them to be” (Penal Law § 125.25 [1] [a] [emphasis added]; see People v McKenzie, 19 NY3d at 466). Indeed, “[application of the statute governing the availability of the defense of extreme emotional disturbance entails in each case an understanding of the situation as it would have been perceived, not by a perfectly sensible individual but by the particular defendant at bar” (People v Liebman, 179 AD2d at 255-256). Clearly, the situation that provoked this defendant to such heinous action was less apparently provocative, incendiary, and volatile than the classic cases where the extreme emotional disturbance defense is invoked, e.g., where a lover is found in a compromising position with another, or where a loved one is in danger, such situations that a “perfectly sensible” person (id. at 255) would more easily find provocative. However, limiting the defense to such situations ignores the mandate that the trier of fact is not to evaluate the reasonableness of the explanation for the extreme emotional disturbance from his or her personal viewpoint, but from the defendant’s unique perspective.
We cannot assess the reasonableness of the defendant’s response in a vacuum. We approach it from his position, which he arrived at after years marked by significant mental infirmity and a lengthy psychiatric history for which he received professional assistance, including hospitalization. He was sleep-deprived. Subjectively, he was in a fragile mental state, which did not arise from the spontaneous situation our dissenting colleagues point to, i.e., the “brief conversation about an upcoming family Easter dinner party” (infra at 92).
We “emphasize,” as did the Court of Appeals, that the objective test “is to be applied to determine whether defendant’s emotional disturbance, and not the act of killing, was supported by a reasonable explanation or excuse” (People v Casassa, 49 NY2d at 679 n 2). While the defendant’s own perceptions were inaccurate, we accept that the defendant’s emotionally disturbed actions, amidst his seriously weakened psychiatric state and given his long history of mental illness, were triggered when Carlucci rebuffed his suggestion that they cancel the Easter dinner party. As the Appellate Division, First Department, *91 recognized in concluding that the defendant was entitled to a reduction of his conviction from murder in the second degree to manslaughter in the first degree in People v Liebman (179 AD2d 245 [1992]), the issue is not whether the defendant’s act of killing “was a reasonable response under the circumstances for, clearly, it was not. Rather, the issue is the reasonableness of the explanation offered for the defendant’s extreme emotional reaction” (id. at 256). That it was the prospect of an upcoming family dinner party that triggered the extreme emotional response is difficult for an individual who is not emotionally disturbed to fathom. However, when we step into this defendant’s perspective, objectively, it is not outside the bounds of reasonableness. This defendant’s unique feeling during the six-month period of overwhelming pressure of “all [his] problems, all [his] stuff,” was compounded by the pressure of having to host “all these people,” his fear that he couldn’t “talk to all these people” when he “couldn’t talk to one,” and then, albeit innocently, by being asked by his loving companion if he was “crazy.” We are of the opinion that this defendant did in fact act under an extreme and uncontrived emotional disturbance, for which there was a reasonable explanation (see People v Casassa, 49 NY2d at 679).
We do not believe that our conclusion impermissibly intrudes on the jury’s province to assess the credibility of expert testimony. The basic facts are undisputed. The relevant difference in the psychiatric testimony is reduced to two opposite opinions as to the reasonableness of the éxplanation for the defendant’s emotional disturbance in the early morning hours of March 22, 2008. Certainly, the jury as the trier of fact could accept or reject the expert opinion with respect to whether the defendant acted under an extreme emotional disturbance for which there was a reasonable explanation (see People v Kwas, 96 AD3d 877 [2012]). However, we, “like the trier of fact [in the trial court], [must] ‘weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony’ ” (People v Bleakley, 69 NY2d at 495, quoting People ex rel. MacCracken v Miller, 291 NY 55, 62 [1943]). Thus, we must be certain that the evidence is of such weight and credibility as to convince us that the jury was justified in rejecting the affirmative defense of extreme emotional disturbance (see People v Cahill, 2 NY3d 14, 58 [2003]). We are convinced that the jury was not justified in concluding that the defendant was not under the influence of *92 an extreme emotional disturbance, for which there was a reasonable explanation, when he attacked and killed Jeanette Carlucci.
Therefore, we reduce the defendant’s conviction of murder in the second degree to manslaughter in the first degree.
The defendant’s remaining arguments are without merit or need not be addressed in light of our determination.
Accordingly, the judgment is modified, on the facts, by reducing the defendant’s conviction of murder in the second degree to manslaughter in the first degree, and vacating the sentence imposed thereon, and as so modified, the judgment is affirmed, and the matter is remitted to the County Court, Westchester County, for resentencing.