People v Andrews (2024 NY Slip Op 01935)

People v Andrews

2024 NY Slip Op 01935

Decided on April 10, 2024

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on April 10, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

VALERIE BRATHWAITE NELSON, J.P.
JOSEPH J. MALTESE
WILLIAM G. FORD
BARRY E. WARHIT, JJ.

2016-08180
 (Ind. No. 2488/13)

[*1]The People of the State of New York, respondent,
v
Spence Andrews, appellant.

Patricia Pazner, New York, NY (Benjamin Welikson of counsel), for appellant.
Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove, Rhea A. Grob, and Rebecca Height of counsel), for respondent.

DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Kings County (Miriam Cyrulnik, J.), rendered July 12, 2016, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials.
ORDERED that the judgment is modified, on the facts, by reducing the defendant's conviction of murder in the second degree to manslaughter in the first degree, and vacating the sentence imposed thereon; as so modified, the judgment is affirmed, and the matter is remitted to the Supreme Court, Kings County, for sentencing on the conviction of manslaughter in the first degree.
The defendant was charged with, inter alia, murder in the second degree in connection with the killing of a fellow patient on March 19, 2013, while the defendant was involuntarily committed at Interfaith Medical Center (hereinafter Interfaith). In response to that branch of the defendant's omnibus motion which was to suppress his statements made to law enforcement officials, the Supreme Court conducted a pretrial Huntley hearing (see People v Huntley, 15 NY2d 72) to determine whether the defendant had the capacity to knowingly, intelligently, and voluntarily waive his Miranda rights at the time the statements were made (see Miranda v Arizona, 384 US 436). After the hearing, the court denied that branch of the defendant's omnibus motion. At trial, the defendant asserted the affirmative defenses of lack of criminal responsibility by reason of mental disease or defect (see Penal Law § 40.15) and extreme emotional disturbance (see id. § 125.25[1][a]). The jury convicted the defendant of murder in the second degree, implicitly rejecting his affirmative defenses.
In fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d 342), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383, 410; People v Bleakley, 69 NY2d 490, 495). Upon reviewing the record here, we are satisfied that the jury's rejection of the defendant's affirmative defense of lack of criminal responsibility by reason of mental disease or defect was not against the weight of the evidence (see People v Romero, 7 NY3d 633). Contrary to the defendant's contention, he failed to [*2]meet his burden of proving that affirmative defense by a preponderance of the evidence (see Penal Law §§ 25.00[2]; 40.15; People v Harrison, 212 AD3d 651; People v Amarillo, 196 AD3d 592, 593; People v Trojan, 73 AD3d 818, 819; People v Collins, 27 AD3d 660, 661; cf. People v Hernandez-Beltre, 157 AD3d 814, 816).
However, we find that the jury's determination that the defendant failed to prove by a preponderance of the evidence that he was acting "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse" (Penal Law § 125.25[1][a]) when he killed the victim was against the weight of the evidence. The defendant's state of mind is a subjective question, and the existence of a reasonable excuse is an objective question (see People v Harris, 95 NY2d 316, 319; People v Moye, 66 NY2d 887, 890). The first element, the "subjective element[,] 'focuses on the defendant's state of mind at the time of the crime and requires sufficient evidence that the defendant's conduct was actually influenced by an extreme emotional disturbance'" (People v Sepe, 111 AD3d 75, 86, quoting People v Harris, 95 NY2d at 319). The second element requires an objective determination as to whether there was a reasonable explanation or excuse for the emotional disturbance, and "[w]hether such a reasonable explanation or excuse exists must be determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, 'however inaccurate that perception may have been'" (People v Harris, 95 NY2d at 319, quoting People v Casassa, 49 NY2d 668, 679).
"In conducting a weight of the evidence review, an appellate court must first determine whether, 'based on all the credible evidence a different finding would not have been unreasonable'" (People v Spratley, 159 AD3d 725, 730, quoting People v Bleakley, 69 NY2d at 495; see People v Danielson, 9 NY3d at 348). "If it would have been reasonable for the factfinder to reach a different conclusion, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions" (People v Spratley, 159 AD3d at 730-731 [internal quotation marks omitted]). "If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict" (id. at 731 [internal quotation marks omitted]).
Here, a different verdict would not have been unreasonable, so we must proceed to weigh the evidence presented at trial and determine whether the jury gave the evidence the weight it should be accorded (see People v Sepe, 111 AD3d at 87). One day prior to the incident, the defendant was involuntarily admitted to the psychiatric unit at Interfaith. According to the defendant's medical records, he was exhibiting "agitated and aggressive behavior" and was "hearing voices." During an interview on the day of the incident, the defendant "appeared confused at times and also appeared to be responding to internal stimuli." After the incident, the defendant was admitted to Bellevue Hospital Center for 13 days, during which time the defendant's presentation was "consistent with the new onset of primary psychotic illness."
The defendant, who had no prior convictions, admitted to pushing the victim after the victim allegedly touched the defendant's genital area while in the shower. According to the defendant's medical records, immediately following the incident, the defendant "came out of the shower with only [ ] boxer" shorts on, at which point he was addressed by a technician at the nursing station. The defendant informed the technician that "somebody violated him" and the defendant was described as "appear[ing] confused and disorganized." The victim was discovered in the shower while the defendant was speaking with the technician. The victim had sustained 13 lacerations to his head and face, his skull was fractured, and his brain was bruised. At trial, a medical examiner testified that the victim's cause of death was blunt force trauma to the head and compression or strangulation injuries to the neck.
While the brutal nature of the attack does not itself prove, with nothing more, that the defendant acted under an extreme emotional disturbance, the evidence also establishes that the defendant was suffering from delusions, agitated behavior, and the new onset of a primary psychotic illness at the time of the incident. Accordingly, we determine that, subjectively, the defendant was under the influence of an extreme emotional disturbance at the time of the incident (see id. at 89).
Turning to the objective element, we find that, from the defendant's unique [*3]perspective, there was a reasonable explanation for his emotional disturbance. While the defendant admitted that he was not bothered by the victim's alleged sexual advances earlier in the evening, the defendant was not receptive to such advances while he was in the shower. According to the defendant, after he pushed the victim, the victim fought back, which, as the defendant described, caused the "animal" to come out of him. The defendant's expert testified that, considering the defendant's mental state at the time, a situation that he perceived as threatening his bodily autonomy "could certainly trigger the psychosis" and "extreme behavior." As such, we find that the defendant established the defense of extreme emotional disturbance by an overwhelming preponderance of the evidence (see Penal Law § 25.00[2]). Accordingly, we find that the defendant acted under an extreme emotional disturbance, for which there was a reasonable explanation (see People v Casassa, 49 NY2d at 679; People v Sepe, 111 AD3d at 91), and that his conviction should be reduced accordingly.
The defendant's further contention that he was deprived of the effective assistance of counsel is without merit. To prevail on a claim of ineffective assistance of counsel under the federal standard, a defendant must satisfy a two-pronged test: (1) the defendant "must show that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (Strickland v Washington, 466 US 668, 688, 694). To prevail on a claim of ineffective assistance of counsel under the New York State standard, a defendant must show that he or she was not afforded meaningful representation (see People v Benevento, 91 NY2d 708, 712; People v Baldi, 54 NY2d 137, 147). "Meaningful representation is determined by an examination of the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation" (People v Mendoza, 33 NY3d 414, 418 [internal quotation marks omitted]; see People v Baldi, 54 NY2d at 147). "It is defendant's burden 'to demonstrate the absence of strategic or other legitimate explanations' for alleged shortcomings" (People v Mendoza, 33 NY3d at 418, quoting People v Rivera, 71 NY2d 705, 709; see People v Benevento, 91 NY2d at 712-713).
Here, contrary to the defendant's contention and the position of our dissenting colleague, defense counsel was not ineffective for declining to introduce the defendant's medical records into evidence at the Huntley hearing. The detective who interviewed the defendant did so only after consulting with the chairman of the Department of Psychiatry at Interfaith, who concluded that the defendant would understand the Miranda warnings, as well as the psychiatrist in charge of the emergency room at Kings County Hospital Center (hereinafter Kings County Hospital), who similarly determined that the defendant had the mental capacity to speak with the detective and answer his questions. The defendant's medical records from Kings County Hospital documented the findings of its psychiatrist, who conducted a mental status examination of the defendant shortly before the administration of the Miranda warnings in the psychiatrist's presence. According to those records, the defendant articulated his "full understanding" of the detective's request to speak with him about the incident and "demonstrated through his mental status exam his mental capacity to make [that] decision." Additionally, the records reflected that the defendant "freely consented to talk with the detectives who both read him his rights and obtained his signature." These findings, as recounted in the medical records, undercut the defendant's claim that he lacked the ability to comprehend his Miranda warnings. The defendant thus failed to demonstrate the lack of a strategic explanation for defense counsel's decision not to seek to admit the records into evidence at the suppression hearing (see People v Benevento, 91 NY2d at 712-713; People v Tirado, 221 AD3d 834, 835; People v Love, 85 AD2d 799, affd 57 NY2d 998).
Similarly, the reports from the defendant's examinations pursuant to CPL article 730, which the defendant also referenced in support of his omnibus motion, inter alia, to suppress his statements, did not show that the defendant lacked the ability to understand the Miranda warnings. Those examinations were conducted approximately two months after the incident and, in any event, the defendant was found fit to proceed to trial. Defense counsel also was not ineffective for declining to present, at the Huntley hearing, the testimony of the defense expert who testified at the trial. The defense psychiatric expert's testimony was central to the two defenses offered at trial, and defense counsel could have reasonably determined, as a matter of strategy, that it would be [*4]prejudicial to reveal to the People, at the pretrial stage, the details of the expert's testimony (see People v Benevento, 91 NY2d at 712-713; cf. People v Love, 85 AD2d at 799). Accordingly, the defendant failed to demonstrate that his attorney lacked a reasonable and legitimate strategy under the circumstances for declining to introduce the aforementioned evidence at the Huntley hearing.
Further, the record as a whole establishes that defense counsel competently represented the defendant. At the Huntley hearing, defense counsel thoroughly cross-examined the detective and made appropriate arguments in support of suppressing the defendant's statements. At trial, defense counsel, among other things, made a coherent opening statement, appropriately cross-examined the People's witnesses, presented a coherent defense, which included the presentation of expert psychiatric testimony, and made a cogent closing statement (see People v Arroyo, 128 AD3d 843, 844; People v Greene, 110 AD3d 827, 828). Moreover, as set forth above, we find that, with defense counsel's assistance, the defendant established the affirmative defense of extreme emotional disturbance (see People v Hudson, 23 AD3d 581). In sum, viewing the record in its entirety, the defendant received meaningful representation (see People v Benevento, 91 NY2d 712-713; People v Arroyo, 128 AD3d at 844).
The defendant's contention that his rights to due process and a fair trial were violated by references, by the prosecutor and the People's expert witness, to his invocation of his right to counsel is unpreserved for appellate review and we decline to review it in the exercise of our interest of justice jurisdiction (see CPL 470.05[2]).
The defendant's remaining contention need not be reached in light of our determination.
MALTESE, J.P., FORD and WARHIT, JJ., concur.
BRATHWAITE NELSON, J.P., dissents, and votes to reverse the judgment of conviction, on the law, vacate the denial of that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials, and remit the matter to the Supreme Court, Kings County, for a new hearing and determination of that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials, and a new trial thereafter.
In this appeal, the Court is presented with an issue concerning the right to the effective assistance of counsel guaranteed under both the Federal and the New York State Constitutions (see US Const Amend VI; NY Const, art I, § 6; Strickland v Washington, 466 US 668; People v Baldi, 54 NY2d 137). This fundamental constitutional protection is guaranteed at every critical stage of the prosecution, including the suppression hearing (see People v Clermont, 22 NY3d 931, 934). I do not believe that my colleagues in the majority are correct in deciding that the defendant was provided with meaningful representation at the suppression hearing notwithstanding the complete and unexplained failure of his attorney to introduce any of the available psychiatric evidence substantiating the defendant's severe mental illness to support the claim that the defendant did not knowingly waive his Miranda rights (see Miranda v Arizona, 384 US 436). I am, therefore, compelled to respectfully dissent.
In March 2013, the defendant, then 20 years old, began to hear voices and to display "increasingly bizarre behavior," such as moving his lips as though he were talking, although he was not audibly speaking. One evening, the defendant left the home that he shared with his grandmother and other family members and did not return for four days. During his absence, the defendant called his grandmother and reported his whereabouts around New York City, including that he was in a warehouse near the Brooklyn Bridge because "the voices" had told him to go there. After four days, the defendant appeared in front of the family home, pacing back and forth. There was snow on the ground, yet the defendant had on no coat or shoes and "looked dirty." He initially resisted his grandmother's pleas to come inside, telling her that he was scared. He eventually came into the home and insisted on going room to room with his grandmother to be sure that no one else was there. While his grandmother was making food for him, the defendant asked her whether she could hear [*5]the voices in his head and then fell into her arms saying that he was tired. The defendant continued to hear voices and to "mouth[ ] no words." The family called an ambulance, and the defendant was involuntarily admitted to Interfaith Medical Center (hereinafter Interfaith) on March 18, 2013, at 8:01 p.m.
When the defendant arrived at Interfaith, he was noted to be "unpredictable and agitated," with aggressive behavior. The defendant was pacing, attempted to escape from the hospital, and was combative with the security officers. The following morning, on March 19, 2013, the defendant was noted to be "disorganized" and complained of auditory hallucinations. Interfaith records indicate that the defendant reported that he had been "seeing shadows trying to pull him down for [a] couple of months" and that he was paranoid being alone, as someone was going to kill him. He reported that he had begun "not feeling well" approximately three to four months earlier after he had gone out with a friend and "drank and took mollies." The defendant also reported that he had smoked marijuana during the four days that he was missing from his home. An attending physician determined that the defendant was suffering from a substance induced psychotic disorder. The defendant was interviewed by a psychologist at approximately 6 p.m. on March 19, 2023, and the defendant appeared "confused" and to be responding to internal stimuli. He had difficulty answering questions and gave a "disjointed narrative."
According to the defendant's medical records, a few hours after the interview, at approximately 9:07 p.m., the defendant appeared near the nursing station, dripping wet, and wearing only "a boxer." He "appeared frantic" and complained to the nurse that he had been "violated" in the shower by a tall man. The defendant was unable to explain further. He appeared "confused and disorganized" and was unable to recall that his family had visited him earlier or that he had taken medications. A nurse attempted to assist the defendant "with reorientation with reality," and another staff member went to investigate what had happened. Staff members found the body of another patient (hereinafter the decedent) in the shower. A subsequent autopsy revealed that the decedent had died from blunt impacts to the head and compression of the neck.
After police responded to Interfaith, the defendant was briefly interviewed by Titus Okunlola, a staff psychiatrist who had had no prior interactions with the defendant. Okunlola concluded that the defendant was not suffering from any "command hallucination," meaning that he was not "responding to any voices asking him to do anything" and that he would be able to understand questions by the police. The defendant was transferred to the forensic unit at Kings County Hospital Center (hereinafter Kings County Hospital) for police questioning.
At approximately 1:15 a.m. on March 20, 2013, while the defendant was handcuffed to a bed, Jeffrey Hamblin, a psychiatrist, determined that the defendant's mental status was "within the normal realms" and that he would be able to "participate fully and to respond" to an interrogation. A detective advised the defendant of his Miranda rights and the defendant indicated that he was willing to speak with the detective. The detective questioned the defendant from approximately 2:00 a.m. until 3:45 a.m. During that time, the defendant stated that he had been showering when the decedent came into the shower stall and grabbed the defendant's genitals. In response, the defendant pushed the decedent causing him to fall. Following the interview at Kings County Hospital, the defendant was transported to a police station. The detective interviewed the defendant again at the station, and the defendant admitted to fighting and punching the decedent during the incident and that the decedent may have hit his head when he fell to the floor. During the interview, the defendant made a written statement that was consistent with his oral statements that the decedent had grabbed the defendant "inappropriately" in the shower and that a fight ensued during which the defendant hit the decedent multiple times.
The following day, on March 21, 2013, the defendant was returned from the police station to Kings County Hospital after he "beat up his cell mate and tried to kill himself." The attending physician observed the possibility that the defendant was "objectively psychotic" and concluded that the defendant was in need of forensic psychiatric admission. The defendant was transferred to the psychiatry department of Bellevue Hospital Center (hereinafter Bellevue).
Attending notes from the defendant's admission to Bellevue on March 22, 2013, noted the unlikelihood that the defendant's psychotic illness was substance abuse related because of the amount of time that he had been either in custody or in inpatient psychiatric care. On March 25, 2013, a physician observed that, given the defendant's age, it was possible that he was experiencing "the first episode of a primary psychotic illness, such as Schizophrenia, [or] Schizoaffective or Bipolar Disorder." On March 30, 2013, progress notes concluded that the defendant's "presentation and . . . history, gathered over the course of this week, are most consistent with the new onset of primary psychotic illness. He clearly had an episode of psychosis." The defendant was discharged from Bellevue on April 3, 2013. The discharge notes indicated that the defendant had presented as paranoid, with auditory hallucinations, and that, since his admission, symptoms of primary psychotic illness had remitted. In regards to the defendant's primary diagnosis, the discharging physician observed that "it appear[ed] more likely that the [defendant] suffer[ed] from a primary psychotic disorder rather than a substance induced psychotic disorder." The physician noted that a marijuana-induced psychosis would generally be "shorter las[t]ing and less intense," and since the report of "Molly" use was a couple of months prior to the psychosis, that could not be its cause. Thus, "[g]iven the length of time of the episode, the intensity of the psychosis and the patient's age, his history and presentation seem most consistent with a primary psychotic disorder." The defendant's principal diagnosis was "paranoid type schizophrenia, unspecified," and he was discharged with medications to treat that disease.
One week later, the defendant was returned to Bellevue after he reported that voices were telling him to harm others. He remained there for more than one month and continued to have psychotic symptoms on the highest dose of the medication that he had been prescribed. The defendant's medication was switched and his condition improved. He was discharged on May 23, 2013, with a primary diagnosis of "paranoid type schizophrenia, unspecified" and a treatment plan to continue the medication for psychosis. Pending trial, during the next three years, the defendant continued to receive psychiatric treatment for paranoid schizophrenia.
Prior to trial, the defendant moved, inter alia, to suppress the statements he made to the police on the ground, among others, that the defendant was incapable of making an informed decision to waive his rights at the time of the interrogation. The defendant pointed to the fact that he was in a mental institution at the time of the incident and that he ultimately was diagnosed with paranoid schizophrenia. At the suppression hearing, the People presented the testimony of the detective who had interviewed the defendant. The defense did not present any evidence. Defense counsel was well aware of the above-referenced, voluminous psychiatric documentation concerning the defendant's mental illness. However, defense counsel failed to move to admit into evidence any of these records. Rather, in support of the motion to suppress, defense counsel merely presented arguments that the defendant's mental state at the time that the Miranda warnings were administered precluded the admissibility of his statements to the detective. Significantly, when defense counsel began to summarize the defendant's condition that led to his hospitalization at Interfaith, the Supreme Court interrupted to remind defense counsel that he could not testify and should only comment on what had been placed into the record. Notwithstanding this reminder by the court, defense counsel continued without presenting to the court any psychiatric documentation concerning the defendant's mental status. Without the necessary evidentiary foundation, defense counsel asserted, among other arguments, that the defendant lacked the ability to voluntarily waive his Miranda rights at the time of the interrogation.
Thereafter, in opposing suppression, the prosecutor observed that, although the defense had the opportunity, it did not present any evidence at the suppression hearing to establish that the defendant was psychiatrically unfit at the time he was questioned by the detective. Inexplicably, the record reflects that defense counsel remained silent and continued to make no effort to submit any of the defendant's psychiatric records. The Supreme Court agreed with the prosecutor and denied that branch of the motion which was to suppress the defendant's statements, observing that there was no evidence in the record that the defendant "was not fit or that some psychiatric or mental condition prevented him from understanding and voluntarily waiving his rights." The court further noted that the detective testified that a doctor had advised the detective that the defendant was calm, coherent, and cooperative, and the defense failed to put any evidence in the record to challenge [*6]or contradict that conclusion. Following trial, at which the People presented the defendant's statements to the jury, the defendant was convicted of murder in the second degree.
On appeal, the defendant contends that he was denied the effective assistance of counsel at the suppression hearing when his attorney failed to introduce the available psychiatric evidence substantiating the severity of his mental illness to support the claim that the defendant did not knowingly waive his Miranda rights. In my view, under the circumstances of this appeal, the only possible conclusion is that the defendant was not provided with meaningful representation at the suppression hearing. Thus, I agree with the defendant that defense counsel's failure in this regard deprived him of the effective assistance of counsel, and, thus, a new trial is warranted. I, therefore, respectfully dissent.
A criminal defendant is guaranteed the effective assistance of counsel under both the federal and the New York State constitutions (see US Const Amend VI; NY Const, art I, § 6). Under the federal standard for ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (Strickland v Washington, 466 US 668, 694). Under the New York standard, the court reviews "the evidence, the law, and the circumstances of [the] particular case, viewed in totality and as of the time of the representation" to ascertain whether "the attorney provided meaningful representation" (People v Baldi, 54 NY2d 137, 147).
A defendant has a constitutionally protected right to the effective assistance of counsel "at every stage of a criminal proceeding" (People v Ross, 67 NY2d 321, 324; see Coleman v Alabama, 399 US 1, 9-10; People v Cunningham, 49 NY2d 203, 207). "Effective assistance of counsel at a suppression hearing is of great significance since the determination of a motion to suppress evidence is a crucial step in a criminal prosecution, and it may often spell the difference between conviction or acquittal, for the evidence [that is a subject of the hearing] may constitute the principal, if not the only, means of establishing the defendant's guilt" (People v Costan, 169 AD3d 820, 822 [internal quotation marks omitted]; see People v Anderson, 16 NY2d 282, 287).
"[F]or a statement to be admissible, the People must prove a voluntary, knowing, and intelligent waiver of the privilege against self-incrimination" (People v Aveni, 100 AD3d 228, 236; see Miranda v Arizona, 384 US at 444). The circumstances to consider in assessing whether a statement was voluntary include the length, location, and continuity of the interrogation, the defendant's age, intelligence, education, physical condition, and mental health, and whether he or she has the capacity to understand the warnings given (see Withrow v Williams, 507 US 680, 693; Fare v Michael C., 442 US 707, 725; People v Dunn, 195 AD2d 240, 243 affd 85 NY2d 956). "A defendant's mental deficiency weighs against the admissibility of an elicited confession, so that any such confession must be measured by the degree of the defendant's awareness of the nature of the rights being abandoned and the consequences of the decision to abandon them. The analysis must rest on a case-by-case basis, depending on the facts and the totality of the circumstances" (People v Dunn, 195 AD2d at 242-243 [citation omitted]; see People v Cleverin, 140 AD3d 1080, 1081).
Where the People have shown the legality of the police conduct in the first instance, the simple fact that a defendant was a patient in a psychiatric center at the time of the Miranda waiver is insufficient to meet the defendant's burden of persuasion (see People v Love, 57 NY2d 998, 999). Here, in support of that branch of the defendant's omnibus motion which was to suppress the defendant's statements, defense counsel argued that the defendant lacked the capacity to understand the Miranda warnings and referred to the medical records which would have established that the defendant had suffered a psychotic episode and ultimately was diagnosed with paranoid schizophrenia. Defense counsel, however, failed to place that evidence into the record at the suppression hearing (cf. People v White, 85 AD2d 787 [confession was involuntary where evidence established that defendant was a patient in a psychiatric center and had been diagnosed as chronic undifferentiated schizophrenic, and the totality of the circumstances failed to establish a valid Miranda waiver]).
Contrary to the People's contention and the determination of my colleagues in the majority, there is no apparent strategic reason for defense counsel's failure to present any evidence at the suppression hearing to support his contentions regarding the defendant's mental state (see generally People v Rivera, 71 NY2d 705, 709). That branch of the defendant's omnibus motion which was to suppress the defendant's statements was predicated on the defendant's inability to validly waive his Miranda rights at the time of the interrogation. While my colleagues in the majority weigh the strength of such evidence to conclude that there was a strategic reason for defense counsel's neglect to submit the medical records and other potential evidence, defense counsel's deficiency rests in his failure to present any evidence whatsoever to support the argument that he made in support of suppression. Having depended upon the argument, there is no legitimate strategic choice in failing to support it with any evidence at all.
The record is clear that defense counsel's complete and total failure to support the subject branch of the defendant's omnibus motion with any evidence did not occur in isolation. Rather, as noted, defense counsel's egregious failure is also reflected in the suppression hearing record when the Supreme Court found it necessary to interrupt defense counsel with a reminder that he should only comment on what had been placed into the record. The failure is again reflected when the prosecutor observed that defense counsel did not present any evidence at the suppression hearing to establish that the defendant was psychiatrically unfit and incapable of voluntarily waiving his Miranda rights. Despite these reminders of the deficiency of the record, defense counsel continued to fail to submit any evidence to substantiate his claim regarding the defendant's mental condition. In the absence of the defendant's records or other comparable evidence, there was no factual basis for defense counsel's contention.
Further, while the defendant's medical records included the assessment of Okunlola at Interfaith, that the defendant would be able to understand "what police detectives would ask him," and the assessment of Hamblin at Kings County Hospital, that the defendant's mental status at the time of interrogation was "quite within the normal realms," the determination of whether the defendant validly waived his Miranda rights was for the Supreme Court to make (see generally People v Jin Cheng Lin, 26 NY3d 701, 719). The defendant's medical records, including the determinations of his treating physicians, which called into question the soundness of the conclusions of Okunlola and Hamblin regarding the defendant's mental state at the time of interrogation, would have provided defense counsel with a factual basis to support his argument that the defendant lacked the capacity to validly waive his Miranda rights.
Defense counsel's failure to submit any evidence substantiating the defendant's mental condition at the relevant time prejudiced the defendant and rendered counsel's representation ineffective (see People v Clermont, 22 NY3d at 933; People v Bennett, 29 NY2d 462; People v Corchado, 175 AD3d 705, 708). Since the defendant was deprived of the effective assistance of counsel, reversal is warranted.
In view of the foregoing, I do not reach the defendant's remaining contentions.
ENTER:
Darrell M. Joseph
Clerk of the Court