OPINION OF THE COURT
 

 Graffeo, J.
 

 In this prosecution stemming from the brutal stabbing by defendant of his common-law wife, the Appellate Division reversed defendant’s conviction of murder in the second degree based on the trial court’s failure to charge the jury concerning the affirmative defense of extreme emotional disturbance. Because the evidence at trial was insufficient to support the defense of extreme emotional disturbance, we reverse the Appellate Division order and reinstate defendant’s conviction.
 

 Defendant was charged with murder in the second degree based on the December 1991 stabbing death of Lillian Rivera in the Manhattan apartment they shared. He was convicted of murder in the second degree at his first trial, at which he neither requested nor received an extreme emotional disturbance charge. The conviction was reversed on appeal due to an improper
 
 Allen
 
 charge and the case was remitted for retrial
 
 (see
 
 239 AD2d 270).
 

 At the second trial, the People offered proof that the victim was stabbed 12 to 14 times in the face, back and chest. She was discovered lying face up on the kitchen floor of the blood-spattered apartment. A trail of blood on the furniture, walls and floors throughout the living room, hallway and kitchen suggested a violent struggle. Forensic evidence indicated the two deep, and ultimately fatal, stab wounds to the victim’s chest had been inflicted last, after she had collapsed on the kitchen floor. The murder weapon was never found.
 

 Gilberto Franco and Norma Ruiz, tenants in the apartment building who were acquainted with defendant and the victim, testified at trial that they had seen the couple arguing in the building lobby earlier that day. Franco recounted that in a conversation he had with defendant two weeks before the stab
 
 *73
 
 bing, defendant confided that his wife was crazy and hooked on drugs, that he was tired and wanted to leave but that he couldn’t live at his sister’s house. At around 4:00 p.m. on the day of the crime, while in his bedroom, Franco heard defendant and the victim engaged in a loud argument inside their apartment, which was connected to his by an airshaft. When Franco heard the sound of glass breaking, he stopped listening and turned on some music.
 

 About 40 or 50 minutes later, Franco and Ruiz heard defendant yelling in the hallway outside their apartment. They opened their door and saw defendant running down the stairs, exclaiming that his wife had killed herself and that someone should call the police. Defendant was carrying a small brown bag under his arm. After Franco contacted the police from a nearby store, he and a friend went to defendant’s apartment. Franco testified that he did not enter the apartment but pushed the door open wide enough to view the interior from the hallway. The apartment was in disarray and there was blood smeared on the walls. Franco saw defendant emerge carrying a duffle bag. When asked where he was going, defendant replied: “I have to take everything out of here because the police is going to check it out.” Defendant stated that he was taking the bag to his sister’s house but would return to talk to the police. He then left the building with the duffle bag.
 

 According to the testimony of Phillip Bell, defendant soon arrived at an apartment in the adjacent building. Bell had no prior acquaintance with defendant but was visiting the tenant. When defendant first arrived, he removed two sweaters that he was wearing and carefully inspected them. He then ingested crack and heroin. Defendant told Bell that “Mama” was dead and he had killed her. He explained that she had been “going crazy” and “tearing up the place” and that he had been “going back and forth upstairs [and] checking on her” all day. After socializing with Bell in a back room for a while, defendant indicated that he had to leave but did not want to be seen by another visitor who had since arrived. Defendant instructed Bell to usher the guest into the bathroom and, once this was accomplished, he departed.
 

 Defendant went to his sister’s apartment where he was greeted by Pedro Malave, her son-in-law. Defendant told Ma-lave that his wife was dead and that she had tried to kill herself two days before. Defendant changed his socks after requesting a clean pair and threw the pair he had been wearing in the garbage. When defendant’s sister arrived, he had a private
 
 *74
 
 conversation with her in which he revealed that, in the course of an argument, he had hit his wife and believed that she was dead. She advised him to go to the police.
 

 Thereafter, defendant appeared at the police station and announced: “My wife killed herself. I want to find out who did this. That’s why I’m here.” Defendant was issued
 
 Miranda
 
 warnings and he agreed to make a written statement, which the People introduced in evidence at trial. Defendant told the police that his wife had been out the night before and had not come home until 6:00 a.m. She had slept most of the morning but then sent him on a series of errands that afternoon, first requesting that he retrieve some items she had thrown out of the window, then asking him to purchase pain reliever, and later sending him to buy cigarettes. Defendant indicated he had complied with these requests.
 

 Defendant further recounted that at around 4:00 p.m. he left the apartment to buy his wife some soup and talked to a neighbor for a while. Upon returning home, he alleged the door was open and there was blood in the living room. He called out to his wife but did not see her until he found her body in the kitchen. He then stated that he ran through the apartment building screaming that “Mama killed herself.” He asked a woman to call the police and then ran down the street to his aunt’s apartment. When his aunt did not answer the door, he proceeded to his sister’s home. He stated that he spoke with Malave and his sister, but indicated only that he told them “what had happened” at his house. After briefly returning to his aunt’s residence, he contended he went to the police. The statement does not contain any reference to a visit with Bell.
 

 Defendant did not testify at trial and presented one witness in his defense, a forensic pathologist, who opined that the wounds the victim suffered were consistent with an attack by a stranger because there was no mutilation or disfigurement. The thrust of the defense was that the police had the “wrong man” and had rushed to judgment in charging defendant with the crime without searching for the true killer. The defense emphasized the absence of physical evidence linking defendant to the stabbing, his lack of a motive to kill his wife and the failure of the police to conduct various tests which the defense contended might have revealed the identity of the actual perpetrator.
 

 At a charge conference conducted prior to the summations, defendant requested that the lesser included offense of extreme
 
 *75
 
 emotional disturbance manslaughter be submitted to the jury, but made no reference to a charge on the affirmative defense of extreme emotional disturbance. Defense counsel stated that a manslaughter charge “may not in fact be supported by the evidence objectively” but indicated the request was based on “what we anticipate the Prosecution’s closing argument to encompass” given that the People had apparently argued at the first trial that defendant committed the murder after being provoked into a fit of rage. The People objected to the manslaughter charge, asserting there was no evidence of extreme emotional disturbance. Supreme Court denied the charge-down request. The jury convicted defendant of murder in the second degree and he was sentenced to 25 years to life in prison.
 

 The Appellate Division reversed, concluding Supreme Court erred in failing to charge extreme emotional disturbance as an affirmative defense. One Justice dissented and granted the People leave to appeal to this Court.
 

 The affirmative defense of extreme emotional disturbance is addressed in Penal Law § 125.25 (1) (a) and § 125.20 (2), which define the elements of murder in the second degree and manslaughter in the first degree. Read in tandem, these statutes provide that a defendant who proves by a preponderance of the evidence that he or she committed a homicide while “under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse” is guilty of manslaughter and not murder. The “defense allows a defendant charged with the commission of acts which would otherwise constitute murder to demonstrate the existence of mitigating factors which indicate that, although [ ] not free from responsibility for [the] crime, [defendant] ought to be punished less severely”
 
 (People v Casassa,
 
 49 NY2d 668, 675,
 
 cert denied
 
 449 US 842 [1980]). As we recently observed in
 
 People v Harris
 
 (95 NY2d 316, 318 [2000] [quoting
 
 Casassa,
 
 49 NY2d at 680-681] [internal quotations omitted]), the Legislature recognized when it created the extreme emotional disturbance defense that some homicides are worthy of mitigation because they “result from an understandable human response deserving of mercy.”
 

 A defendant cannot establish an extreme emotional disturbance defense without evidence that he or she suffered from a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a loss of self-control. And not all mental infirmities merit a manslaughter charge based on extreme emotional disturbance
 
 (Casassa,
 
 49 NY2d at 677). To prove such an affirmative defense, a defendant must
 
 *76
 
 demonstrate, first, that he or she acted under the influence of an extreme emotional disturbance and, second, that there was a reasonable explanation or excuse for that disturbance. The first, subjective element is met if there is evidence that defendant’s conduct at the time of the incident was actually influenced by an extreme emotional disturbance. The second is an objective element and requires proof that defendant’s emotional disturbance was supported by a reasonable explanation or excuse. This is “determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, however inaccurate that perception may have been, and assessing from that standpoint whether the explanation or excuse for [the] emotional disturbance was reasonable” (Harris, 95 NY2d at 319 [quoting
 
 Casassa,
 
 49 NY2d at 679] [internal quotations omitted]).
 

 A defendant who pursues an inconsistent defense at trial, such as outright denial of involvement in the crime, may nevertheless be entitled to a manslaughter charge based on extreme emotional disturbance
 
 (see People v White,
 
 79 NY2d 900, 903 [1992]). And it is possible for a defendant to establish the presence of such a disturbance without psychiatric testimony
 
 (People v Moye,
 
 66 NY2d 887, 890 [1985]). These circumstances do, however, impact whether sufficient evidence to support the defense has been presented at trial
 
 (see White,
 
 79 NY2d at 903). In the absence of the requisite proof, an extreme emotional disturbance charge should not be given because it would invite the jury to engage in impermissible speculation concerning defendant’s state of mind at the time of the homicide
 
 (People v Walker,
 
 64 NY2d 741, 743 [1984]).
 

 Applying these principles to this case, we conclude that defendant was not entitled to a manslaughter charge-down based on extreme emotional disturbance because the proof was insufficient to support either element of the defense.
 
 *
 
 Beginning with the subjective element, the record is devoid of evidence that he actually suffered from a mental infirmity at the time of
 
 *77
 
 the stabbing. Defendant cannot rely on his statements to the police to establish the presence of an extreme emotional disturbance since he asserted that he had not harmed his wife in any respect. Evidence of mental infirmity is not discernible from defendant’s remarks to Bell and his sister because he neither claimed that he suffered a loss of self-control nor used any other language suggesting that he killed the victim while under the influence of a mental disability. Similarly, defendant’s behavior prior to and immediately after the crime was not indicative of extreme emotional disturbance. Soon after the killing, defendant contrived a false explanation for the victim’s wounds, telling his neighbors that she had committed suicide. Moments later, defendant had the presence of mind to gather items in a duffle bag and remove them from the apartment so they would not be discovered by the police — conduct inconsistent with the loss of self-control associated with the defense. Bell’s testimony regarding defendant’s conversations and drug consumption, particularly his attempt to evade detection by another guest at the apartment, also do not indicate a disturbed state of mind.
 

 This case is similar to
 
 People v White
 
 (79 NY2d 900) which also involved a defendant who killed his wife in the apartment they shared. Like this defendant, White claimed that he had no involvement in the incident but had discovered his wife dead in their apartment. As in this case, no psychiatric evidence was proffered to support an extreme emotional disturbance defense, nor did defendant tell the police or any other witness that he had experienced a loss of self-control or other mental disturbance which caused him to stab his wife. There we held that defendant was not entitled to the charge-down, observing that the record was barren of any statement of defendant or other evidence offered by any witness which suggested defendant actually suffered from an extreme emotional disturbance at the time of the homicide.
 

 Defendant contends that the brutal nature of the stabbing constituted evidence that he acted under the influence of a mental infirmity. While proof concerning the nature of the wounds defendant inflicted is relevant
 
 (see generally, People v Wood,
 
 79 NY2d 958 [1992]), we have never held that a jury may infer the presence of an extreme emotional disturbance based solely on proof that the crime was especially violent or brutal. This is so because violence and brutality are not necessarily indicative of a loss of self-control or similar mental infirmity, nor is brutality generally more deserving of mercy. Where
 
 *78
 
 we have referenced the nature or severity of the wounds, the probative value of such evidence has been linked to other compelling evidence of extreme emotional disturbance. For example, we observed in
 
 People v Moye
 
 (66 NY2d at 890) that “defendant’s savage acts of mutilating and decapitating his victim, coupled with his statements to the police and District Attorney that ‘something snapped’ inside him when [the victim] mocked and taunted him, that he went ‘bananas’ and he needed help, were evidence of a loss of self-control.” The approach defendant suggests would subvert the purpose of the affirmative defense by automatically providing the benefit of a manslaughter charge-down to every defendant who commits a particularly brutal or violent homicide — a result the Legislature certainly did not intend.
 

 Even if sufficient evidence of the subjective element of extreme emotional disturbance were present in this case, proof of the objective element is lacking. Defendant points to the fact that he and the victim had been seen arguing and that the victim apparently sent him on a number of errands on the afternoon of the murder, causing him to climb the stairs to the fifth-floor apartment numerous times. This falls far short of the type of tumultuous relationship that might meet the objective component when coupled with other provocation (see
 
 White,
 
 79 NY2d at 903). In the absence of proof that defendant’s history or mental status rendered him unusually sensitive to these verbal exchanges and demands, no reasonable jury could have concluded that a resulting loss of self-control or similar disability constituted “an understandable human response deserving of mercy” under these circumstances
 
 (see Casassa,
 
 49 NY2d at 680-681).
 

 Finally, we note that the People’s closing argument does not provide an evidentiary basis for an extreme emotional disturbance charge. As cogently stated by the dissenting Justice at the Appellate Division, statements in a summation are not evidence and may not supply proof supporting a charge request. Although certain words and phrases used by the prosecutor may be suggestive of extreme emotional disturbance, when viewed in context it is evident the remarks were consistent with the People’s theory of intentional murder. The clear import of the summation was that defendant’s actions were motivated by intense anger — not that they resulted from a loss of self-control or other mental infirmity.
 

 We have considered defendant’s contentions relating to this Court’s jurisdiction over this appeal and find them to be without merit.
 

 
 *79
 
 Accordingly, the order of the Appellate Division should be reversed and the conviction reinstated.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order reversed and judgment of Supreme Court, New York County, reinstated.
 

 *
 

 Defendant did not characterize his request for the manslaughter charge-down as seeking a charge on the affirmative defense of extreme emotional disturbance. However, due to the interplay between Penal Law § 125.20 (2) and § 125.25 (1) (a), a request for an extreme emotional disturbance manslaughter charge amounts to a request that the jury be instructed concerning the affirmative defense of extreme emotional disturbance. Given the People’s comments in opposition to the defendant’s request and Supreme Court’s stated rationale in denying the charge, the issue is preserved as a question of law for this Court’s review (see CPL 470.05 [2]).