15-1453
*United States v. Delgado*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2019

(Argued: April 28, 2020                    Decided: August 18, 2020)

Docket No. 15-1453

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

JONATHAN DELGADO

*Defendant-Appellant.* [1]

_____

Before: JACOBS, POOLER, and CARNEY, *Circuit Judges*.

Appeal from the judgment of conviction entered in the United States

District Court for the Western District of New York (Richard J. Arcara, *J*.),

convicting Jonathan Delgado, after a jury trial, for conspiracy to violate the

_____

[1] The Clerk of Court is directed to amend the caption as above.

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), as well as narcotics-conspiracy and firearm-possession charges in connection with Delgado's membership in the 10th Street Gang of Buffalo, New York. The underlying racketeering activity included Delgado's participation in the double murder of Brandon MacDonald and Darinell Young in 2006. Delgado, who was seventeen years old when he participated in the murders, was sentenced to life imprisonment.

Delgado argues on appeal that the district court erred by (1) permitting the government to introduce into evidence a gun it seized from his home in 2012; (2) denying his motion for a mistrial based on an apparent *Bruton* violation; (3) denying defendants' joint *Batson* challenge; (4) denying his requests for certain jury charges; and (5) failing to consider his age at the time of the MacDonald and Young murders. We reject his first four challenges but agree with the fifth.

The district court imposed Delgado's sentence without explicitly considering his age at the time of the murders. In doing so, it violated the principle recognized by the Supreme Court in *Miller v. Alabama* that "children are constitutionally different from adults for purposes of sentencing." 567 U.S. 460, 471 (2012). Those under the age of eighteen are different, *Miller* instructs, because

the "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 472. Accordingly, although we affirm Delgado's conviction, we vacate his sentence and remand for resentencing, with instructions to consider the mitigating factors of youth as required by *Miller*.

Delgado was convicted alongside defendants-appellants Domenico Anastasio, Ismael Lopez, and Matthew Smith. We decide the appeal of Anastasio by separate opinion and the appeals of Smith and Lopez by summary order.

Affirmed in part, vacated and remanded in part.

_____

> SCOTT M. GREEN, Rochester, NY, *for Defendant-Appellant Jonathan Delgado.*
>
> MONICA J. RICHARDS, Assistant United States Attorney, *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee*.

POOLER, *Circuit Judge*:

Jonathan Delgado appeals from the March 25, 2015 judgment of conviction entered in the United States District Court for the Western District of New York (Richard J. Arcara, *J.*), convicting him, after a jury trial, of conspiracy to violate

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1962(d), as well as narcotics-conspiracy and firearm-possession charges in

connection with Delgado's membership in the 10th Street Gang of Buffalo, New

York. The underlying racketeering activity included Delgado's participation in

the double murder of Brandon MacDonald and Darinell Young in 2006.

Delgado argues on appeal that the district court erred by (1) permitting the

government to introduce into evidence a gun it seized from his home in 2012; (2)

denying his motion for a mistrial based on an apparent *Bruton* violation; (3)

denying defendants' joint *Batson* challenge; (4) denying his requests for certain

jury charges; and (5) failing to consider his age at the time of the MacDonald and

Young murders. We reject his first four challenges but agree with the fifth.

Delgado, who was seventeen years old when he participated in the

murders, was sentenced to life imprisonment. The district court imposed

Delgado's sentence without explicitly considering his age at the time of the

murders. In doing so, it violated the principle recognized by the Supreme Court

in *Miller v. Alabama* that "children are constitutionally different from adults for

purposes of sentencing." 567 U.S. 460, 471 (2012). Those under the age of

eighteen are different, *Miller* instructs, because the "distinctive attributes of

4

youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 472. Accordingly, although we affirm Delgado's conviction, we vacate his sentence and remand for resentencing, with instructions to consider the mitigating factors of youth as required by *Miller*.

Delgado was convicted alongside defendants-appellants Domenico Anastasio, Ismael Lopez, and Matthew Smith. We decide the appeal of Anastasio by separate opinion and the appeals of Smith and Lopez by summary order.

## BACKGROUND

### I.    Factual Background

The 10th Street Gang has existed in some form on Buffalo's West Side since the 1980s. Like other street gangs, 10th Street enforced its narcotics enterprise through violence. Members regularly planned and carried out shootings in response to actual, or perceived, disrespect. Other gangs operated near and sometimes within the 10th Street Gang territory, including the 7th Street Gang, a rival— and the Zolo Boys, an ally.

There was a semblance of hierarchy to the 10th Street organization. Senior members were considered "shooters" who protected the territory and retaliated

5

against the encroachment of rival gangs. Newer members, some as young as thirteen years old, were expected to "put in work," meaning they had to perform certain criminal—and often violent— acts to increase their status.

On the afternoon of April 16, 2006, a car with 7th Street Gang members drove up to and shot at Robert Sanabria, a 10th Street member and Delgado's younger brother, while he was out walking to a neighborhood cookout with a large group of 10th Street members. A bullet landed in Sanabria's stomach and left him injured on the sidewalk before he was taken away in an ambulance (he survived). Delgado soon arrived on the scene before checking in on Sanabria at the hospital.

Meanwhile, a group of 10th Street members had congregated in an open area of the park next to where Sanabria was shot. As emotions heated up, the group decided that retaliation was in order. The tensions escalated when the group confronted a young man and woman passing by. When someone commented that the couple was affiliated with 7th Street, a few gang members ran up to them and started beating on the man, continuing to kick and punch him after he fell to the ground. The woman tried to provide cover as the gang members delivered additional blows.

Later that night, about a dozen 10th Street members moved from the park to a nearby apartment. There, Delgado announced that the plan was to "shoot at [7th Street Gang members] because they had shot his brother," and he told those present that they needed to find guns. Smith App'x at 2906. Several of those at the apartment then left to gather firearms. Upon returning, they piled guns on top of a bed. Delgado brought two handguns: a .44 caliber and a .380 caliber. Another gang member brought a sawed-down .22 rifle. Members of the Zolo Boys also showed up, bringing two more shotguns.

At some point, a senior 10th Street member dispatched a younger member to search the neighborhood for those affiliated with 7th Street. The reconnoitering member reported back that he saw 7th Street-affiliated people outside a home on 155 Pennsylvania Street. Back at the apartment, the eventual shooters took their preferred weapons. Delgado selected the .380 caliber handgun.

Two cars, one with four armed 10th Street members and the other with the Zolo Boys, drove toward the target home. The 10th Street driver did not want anyone shooting from his car, lest someone shoot at it, so the gunmen instead assembled in an alley where they covered their faces with bandanas and

7

discussed how to carry out the shooting. One of the gunmen suggested that they pose as drug dealers, but Delgado insisted on a direct approach.

The shooters ran up on 155 Pennsylvania and opened fire, spraying more than 50 bullets at the people gathered on and near the porch. Delgado killed Brandon MacDonald. Darinell Young was also killed, and four others were wounded. As it turned out, the casualties were innocent bystanders. The shooters absconded, eventually making their way back to the original apartment.

Continued bloodshed between the two gangs prompted a joint investigation between the FBI and local authorities. The investigation encompassed physical surveillance, more than seven search warrants, video surveillance, controlled evidence purchases, and intelligence provided by confidential informants, who later played a prominent role in the government's case against Delgado and the other codefendants.

Law enforcement eventually obtained medical and ballistics evidence linking MacDonald's death to the bullet discharged from Delgado's .380 caliber

handgun.[2] On February 3, 2012, the FBI arrested Delgado at his home, seizing a small amount of marijuana and an AR-15 .223 Bushmaster rifle ("AR-15").

## II.    Procedural History

A federal grand jury sitting in the United States District Court for the Western District of New York returned a fourth superseding indictment charging Delgado and twenty-eight others with RICO conspiracy in the form of drug trafficking, assault, murder, intimidation, and weapons possession related to their membership in the 10th Street Gang. The indictment identified 124 overt acts committed in furtherance of the RICO conspiracy. Delgado specifically was charged with: one count of conspiracy to violate RICO, in violation of 18 U.S.C. §§ 1962(d) and 1963(d); one count of conspiracy to possess controlled substances with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(D); and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924 (c)(1)(A)(i) and 2. Delgado was also charged under one of the special sentencing factors of the RICO conspiracy with second-degree murder under New York state law for the

---

[2] Unlike his other codefendants, Delgado does not argue on appeal that there was insufficient evidence to support his convictions.

MacDonald and Young killings. The vast majority of the charged defendants entered guilty pleas. Delgado and three other codefendants proceeded to trial.

On July 25, 2014, Delgado filed a motion in limine to preclude the government from introducing testimony concerning the AR-15 that was seized from his home at the time of his arrest. Delgado argued that the AR-15 was irrelevant to the RICO conspiracy because ATF records demonstrated it was lawfully purchased in March 2011 and it was not seized by law enforcement until Delgado's arrest in 2012. The district court denied the motion, reasoning that Delgado's purchase and possession of the AR-15 was relevant to the charged RICO conspiracy because "[g]uns are part of what's been alleged here." App'x at 314.

During jury selection, the government moved to strike two of the three Hispanic Americans among the prospective jurors. The district court considered a joint *Batson* challenge from defendants but ultimately concluded that the government's race-neutral basis for its use of preemptory strikes was credible.

On July 30, 2014, Delgado's trial began. The government called fifty-five witnesses. As relevant to this appeal, Joshua Keats, a New York State Police Investigator, testified as to his post-arrest interview of one of Delgado's

codefendants, Anastasio. Keats testified that Anastasio told him he witnessed the shooting of Sanabria and was present at the apartment where the retaliation was planned. Keats also testified that Anastasio told him that at the apartment "everyone was talking about retaliating for what happened to [Sanabria]," and that Anastasio said "he knew something was going to happen because of the way everyone was talking; that they had to do something about [Sanabria] getting shot in front of Sam's store earlier in the day." App'x at 324. At a break in the proceedings, Delgado moved for a mistrial based on this testimony. He objected to Keats's use of "everyone," when it was apparent that Delgado was one of the people at the apartment. The district court summarily denied the motion.

At the close of the government's proof, Delgado moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) based, in part, on a claim that the government had not demonstrated that the gun possession charge was committed within the five-year statute of limitations. The district court denied the motion. Later, at the jury charge conference, Delgado again requested, without success, an instruction on the statute of limitations for the gun

11

possession. The district court noted that it had already rejected the statute of limitations defense when it denied Delgado's Rule 29 motion.

Subsequently, Delgado requested that the district court instruct the jury on the affirmative defense of extreme emotional disturbance, which, in some circumstances, is available to those accused of second-degree murder under New York state law. The district court declined to give this charge.

After a five-week long trial, the jury returned guilty verdicts on all counts for the four codefendants. On March 25, 2015, Delgado appeared for his sentencing. Based on its calculation under the Sentencing Guidelines, the Probation Office recommended that Delgado serve a custodial term of life imprisonment. Before announcing Delgado's sentence, the district court discussed its view that the gang's violent activities had destroyed Buffalo's West Side community:

> I'm glad I had a chance to hear the evidence in the trial because it really clearly gave me a picture of what was going on. Many times, when we are involved in sentencing people, the judge hears maybe a plea or a limited information about a particular criminal activity, but here, I had the firsthand view of what went on there and how horrible those events were for a long period of time; that went on for such a long time it's hard to believe that it was allowed to go on as long as it was.

One of the most difficult things a judge does is imposing sentences on individuals. It's certainly something I don't enjoy and if there ever comes a point where I do enjoy it, I think that's the day that I'll resign as a judge. It's a difficult part of being a judge is to impose severe sentences or any sentences. But in this situation, obviously, the sentencing range that the guidelines have calculated is the most severe.

App'x at 446-47. The district court then recounted the events that led up to the MacDonald and Young murders and described other violent crimes attributed to Delgado in the Presentence Investigation Report. The court stated that it had reviewed the submissions and considered the sentencing factors set forth in 18 U.S.C. § 3553(a). With respect to Delgado's character, the district court explained:

Defendant appears to be undeterred by the sentence of probation he receive[d] in 2005 and continued his participation into the criminal behavior. He sold drugs, possessed multiple firearms and I don't feel he had any comprehension of the long-term impact and the collateral damage that these crimes have and will continue to have on the community, the families. The social implications of violence are certainly complex and represented a major concern of the citizens. I feel the sentence imposed under these circumstances is a fair and reasonable sentence.

App'x at 451-52.

Ultimately, the district court sentenced Delgado to concurrent terms of life imprisonment on the RICO conspiracy and narcotics-conspiracy counts.[3]

This appeal timely followed.

## DISCUSSION

Delgado argues that (1) the AR-15 was inadmissible because there was no evidence that he used it in furtherance of the charged conspiracies; (2) the district court violated *Bruton* by admitting his codefendant's statement to police that "everyone" at the apartment was "talking" about retaliation; (3) the government impermissibly struck a Hispanic member of the jury pool on the basis of race; (4) the jury should have been instructed on the defense of extreme emotional disturbance and the statute of limitations for the Section 924(c) charge; and (5) the district court violated the Eighth Amendment by failing to consider his age before imposing a life sentence.

---

[3] The court also imposed a consecutive five-year sentence for the weapons-possession conviction.

14

## I.    Admission of the AR-15

We review a district court's decision to admit evidence for abuse of discretion, "recognizing that district courts enjoy broad discretion over the admission of evidence." *United States v. Barret*, 848 F.3d 524, 531 (2d Cir. 2017) (internal quotation marks, brackets, and citation omitted). "Irrelevant evidence is not admissible." Fed. R. Evid. 402. A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A district court's decision to admit evidence is subject to harmless error analysis. Fed. R. Crim. P. 52(a); *United States v. Madori*, 419 F.3d 159, 168 (2d Cir. 2005).

Delgado argues that the district court abused its discretion in admitting the AR-15 because there was no other evidence establishing that Delgado used the assault rifle in furtherance of the charged conspiracies, making its possession irrelevant. Delgado also argues that any possible probity was outweighed by undue prejudice under Rule 403 because the admission of a lawfully purchased assault rifle without a connection to the charged conspiracies "leaves a high probability that the jury would misuse its admission to bolster the testimonies of

15

cooperating witnesses," who testified about Delgado's possession of other guns. Appellant's Br. at 28.

We disagree that the AR-15 was offered for an improper purpose.[4] In context, Delgado's purchase and possession of an assault rifle was, at the very least, relevant to the RICO conspiracy count. The fourth superseding indictment charges in its general allegations that "[i]n order to enforce the authority of the gang, 10th Street gang members maintained a ready supply of firearms, including handguns, shotguns, and semi-automatic rifles. Weapons were to be sold to others, or otherwise discarded, after having been used to commit acts of violence on behalf of the organization." App'x at 67. The government introduced evidence at trial and argued in its theory of the case that 10th Street members kept a ready stock of guns as part of the security function of the enterprise. Witnesses testified that members routinely gave firearms to one another by hiding guns in a communal stash at the park and had knowledge of other members' firearms. There was testimony demonstrating that other gang

---

[4] Because we conclude that the testimony was offered for a proper purpose, we reject Delgado's argument that the testimony was only offered to show criminal propensity in violation of Federal Rule 404(b) of Evidence.

members were aware that Delgado purchased and owned the AR-15. Delgado's possession of the assault rifle was relevant to the allegations of the RICO conspiracy that charged defendants with using, brandishing, and exchanging firearms as part of the illicit enterprise.

We also disagree with Delgado's argument that his possession of the AR-15 had no connection to the charged conspiracy because "[t]here was no testimony presented at trial to indicate [Delgado] participated in the conspiracies contained in the Indictment after June, 2007." Appellant's Reply. Br. at 2. As alleged in Count 1 of the indictment, "beginning in or about 2000 and continuing to in or about 2011," Delgado was part of a gang that sold narcotics and protected its territory by using, carrying, and possessing firearms. App'x at 299. Delgado's argument fails because there was no evidence that he ever withdrew from the conspiracy and ATF records confirm that he purchased the AR-15 in early 2011, which, as a temporal matter, was within the time period of the alleged RICO conspiracy.

We find no abuse of discretion in the district court's determination that the probative value of this evidence is high and that it tends to illuminate the issues in the case rather than mislead the jury. As noted above, a Rule 403 challenge is

"highly deferential" to the district court. *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012). There was nothing unduly prejudicial about the AR-15 simply because it also happened to bolster witnesses' testimony about other firearms. Delgado does not cite to any authority that supports excluding evidence on this ground.

Even assuming arguendo there was error, it would be harmless. We consider several factors in determining whether an evidentiary error is not harmless and thus requiring a new trial:

> In assessing the wrongly admitted testimony's importance, we consider such factors as whether the testimony bore on an issue that is plainly critical to the jury's decision, whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, and whether the wrongly admitted evidence was emphasized in arguments to the jury.

*Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) (citations and internal quotation marks omitted).

In light of the strength of the government's case, our review of the record demonstrates that the AR-15 was "unimportant in relation to everything else the jury considered on the issue[s] in question." *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) (internal quotation marks and citation omitted). In its summation, the government argued (1) that Delgado's possession of the AR-15

18

was evidence, on its own, that that he was guilty of the Section 924(c) charge; and (2) that it was probative of his guilt concerning the narcotics conspiracy and RICO conspiracy offenses, because there was testimony that he displayed the firearm to other gang members.

Delgado's possession of the assault rifle was plainly not essential to either of the conspiracy counts, which charged a broader scheme. Delgado's only colorable argument for a new trial is if the AR-15 was used by the jury as the sole basis for its guilty verdict on the Section 924(c) charge. But the AR-15 evidence was not critical to the Section 924(c) count either. In the few instances when the government referenced the AR-15 in its summation, it did so in the context of Delgado possessing other firearms—at one point arguing that the jury "heard at least about half a dozen guns possessed by Delgado, himself, to include the [AR-15]." Smith App'x at 4990.

A raft of government witnesses placed a gun in Delgado's hands during the conspiracy—including during the murders of MacDonald and Young—any of which could have formed the basis of the jury's guilty verdict on the Section 924(c) count. *See United States v. McCallum*, 584 F.3d 471, 478 (2009) ("We have repeatedly held that the strength of the government's case is the most critical

19

factor in assessing whether error was harmless."). In sum, vacatur would not be warranted even if the district court erred because there was overwhelming evidence presented at trial concerning Delgado's possession of firearms.

## II.  *Bruton*

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when a codefendant's confession implicating the defendant is admitted at their joint trial, irrespective of whether the court instructs the jury that the confession can only be used against the defendant who made it. Our Court later held that a "defendant's *Bruton* rights [are] violated . . . only if the statement, standing alone, would clearly inculpate him without [the] introduction of further independent evidence." *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985). That principle was enunciated by the Supreme Court in *Richardson v. Marsh*, which also held that *Bruton* can be complied with by redacting the statement so that it does not expressly implicate the codefendant as an accomplice. 481 U.S. 200, 209 (1987).

Delgado argues that New York State Police Investigator Keats's testimony about his post-arrest interview of Anastasio impermissibly inculpated Delgado,

thereby denying his Sixth Amendment right to confront the witnesses against him because Anastasio was a nontestifying codefendant.

Delgado's reliance on *Bruton* is inapt. Anastasio neither confessed to a crime nor named anyone as a participant in a crime. The statement that "everyone was talking about retaliating for what happened to [Sanabria]" was not a confession, nor did it, by itself, implicate any of the codefendants in a crime. App'x at 324. The statements required further evidence to link Delgado's involvement to the murders. There was nothing facially incriminating with gang members merely "talking" about retaliation at the apartment, which Delgado's counsel essentially acknowledged when he moved for the mistrial on the grounds that these statements "couple[d] . . . with the testimony" that was anticipated in the case would inculpate Delgado. *See* App'x at 326. Finally, the statements were already generalized and thus did not require redaction. For these reasons, we conclude that Delgado's right to confrontation was not jeopardized by Keats's testimony.

## III.   *Batson* Challenge

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court fashioned a three-part test that trial courts are to use when considering whether a

peremptory strike of a jury panelist is based on an impermissibly discriminatory motive. A trial court must:

> (1) decide whether the defendant has made a *prima facie* showing that the prosecutor has exercised a peremptory strike on the basis of race;
> (2) if so, decide whether the prosecutor has satisfied the burden of coming forward with a race neutral explanation for striking the potential juror; and, if so, then must
> (3) make a determination whether the defendant has carried his burden of proving purposeful discrimination.

*Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000). Ordinarily, at the third step, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir. 2003) (internal quotation marks and citation omitted). Deference will be given to the trial court findings on the issue of discriminatory intent and will be set aside only if the determination is clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 365 (1991).

The prosecutor struck prospective juror #41, who is Hispanic, on the grounds that she did not like to read the news because of its ugliness, and that she was heavily involved with her church. Delgado argues that this justification was pretextual because other jurors said the same thing and were not stricken.

Assuming, as the district court did, that Delgado made a prima facie case at the first step, the court did not clearly err in rejecting the *Batson* claim. Delgado's argument is belied by the record; the prosecutor struck other potential jurors who claimed to not read the news. Moreover, none of them described their news-avoidance in quite the same way as the stricken juror, who said she did not read the news "because there [is] too much ugliness in the now-a-day world." Smith App'x at 1490. In the context of a criminal trial involving multiple murders, shootings, robberies and drug sales, excluding a juror on this basis does not seem so far-fetched. And, as the government points out, one of the other Hispanic Americans in the venire eventually served on the jury panel. On this record and considering the deference we accord to the district court in credibility determinations, we conclude that the court did not clearly err in rejecting defendants' joint *Batson* claim.

## IV. Jury Charges

We review jury instructions de novo but reverse only if we determine that the instructions, taken as a whole, prejudiced the defendant. *United States v. Finazzo*, 850 F.3d 94, 105 (2d Cir. 2017). "The defendant bears the burden of showing that the requested instruction accurately represented the law in every

respect and that, viewing as a whole the charge actually given, he was prejudiced." *United States v. Rutigliano*, 790 F.3d 389, 401 (2d Cir. 2015) (internal quotation marks and citation omitted).

### A. Extreme Emotional Disturbance

Delgado argues that the district court erred by refusing his request to charge the jury with the defense of extreme emotional disturbance. Under New York law, extreme emotional disturbance is a partial affirmative defense to murder in the second degree. *See* N.Y. Penal Law § 125.25(1)(a)(i). It is available when "[t]he defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Id.; see also People v. White*, 79 N.Y.2d 900, 902-04 (1992). It requires evidence that the defendant suffered from "a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a loss of self-control." *People v. Roche*, 98 N.Y.2d 70, 75 (2002).

Delgado argues that the emotional trauma he suffered from learning that his younger brother was shot supported such a jury instruction. According to Delgado, he "came to the scene of the shooting and learned that his brother was shot by rival gang members. Throughout the day and into the evening, the

24

Defendant was with individuals who demanded retaliation for his brother's shooting." Appellant's Br. at 39-40. This, in turn, made him "angry" and he "cried and sought revenge." *Id.*

Yet Delgado has failed to summon any evidence that lends support for the instruction besides the bare assertion that he was angry and vengeful following the shooting of his brother. *See Roche*, 98 N.Y.2d at 76 ("In the absence of the requisite proof, an extreme emotional disturbance charge should not be given because it would invite the jury to engage in impermissible speculation concerning defendant's state of mind at the time of the homicide."). New York law is clear that anger alone does not amount to a mental infirmity or the loss of self-control associated with the defense of extreme emotional disturbance. *People v. Walker*, 64 N.Y.2d 741, 743 (1984). Accordingly, we conclude that the district court was correct to reject the requested jury charge.

### B. Statute of Limitations

Delgado also argues that the district court erred by denying his request to "charge the jury regarding Statute of Limitations and/or to make a finding

concerning when the jury believed the Defendant was last in possession of a firearm in furtherance of drug trafficking." Appellant's Br. at 40. Since the federal criminal code provides a five-year statute of limitations for noncapital offenses, Delgado argues that the district court should have given a statute-of-limitations instruction for the firearm possession count under Section 924(c). *See* 18 U.S.C. § 3282(a). As noted above, the court summarily denied Delgado's request for the jury charge, citing to its earlier Rule 29 ruling that there was sufficient evidence for the jury to find that Delgado violated Section 924(c) within the five-year statute-of-limitations. *See* Fed. R. Crim. P. 29(a) (providing that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.").

The court thus mistakenly borrowed that stringent standard for use in Delgado's request for a particular jury charge, which in part may be justified "on any defense theory for which a foundation existed in the record." *United States v. Caplan*, 703, F.3d 46, 87 (2d Cir. 2012). In other words, that the jury could find that Delgado violated Section 924(c) within the statute-of-limitations period did not foreclose the opposite finding.

26

In any event, the outcome was correct, albeit for a different reason. There was no way for the jury to convict Delgado on the Section 924(c) count based on conduct outside the statute of limitations under our Court's precedent. Even if we were to assume that the jury believed Delgado's argument that his possession of the AR-15 occurred outside the temporal scope of the conspiracy, and voted to convict, for example, based only on his 2006 role in the MacDonald and Young murders, that violation of Section 924(c) was a "continuing offense" that "continued through the life" of the 10th Street Gang's RICO conspiracy. *United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010) ("Conspiracy is a continuing offense. . . . When a defendant is convicted of violating § 924(c)(1)(A) for using or carrying a firearm during and in relation to a crime that is a continuing offense, the § 924(c)(1) crime itself is a continuing offense.").

Delgado cites *United States v. Praddy*, which carves out an exception to the rule that possession is presumed to continue until the underlying conspiracy runs its course. 725 F.3d 147, 157-59 (2d Cir. 2013). But his reliance on *Praddy* is misplaced. In that case, law enforcement had actually seized the weapon in question six years before the defendant was charged with its possession. *See Praddy*, 725 F.3d at 159 (stating "it would defy all reason to give effect to that

27

presumption after such time as the gun has in fact been seized by law enforcement authorities."). That factual distinction is not present here: law enforcement did not seize any of Delgado's weapons outside the statute of limitations. And, crucially, as noted above, there was no evidence showing that Delgado ever withdrew from the conspiracy, so his participation is presumed to extend through 2011. *See United States v. Yannotti*, 541 F.3d 112, 123 (2d Cir. 2008) ("[O]nce the government meets its burden of proof to establish a RICO conspiracy, it is entitled to a presumption that the conspiracy continued until the defendant demonstrates otherwise." (internal quotation marks, brackets, and citation omitted)). Accordingly, the jury could not have found that any violation of Section 924(c) ceased in 2006, obviating the need for the statute-of-limitations instruction.

## V. Delgado's Sentencing

Delgado, who was seventeen at the time of the MacDonald and Young murders, argues that the district court violated the Eighth Amendment by failing to give the requisite weight to his youth before sentencing him to life imprisonment. In 2012, the Supreme Court held that mandatory life-without-parole sentences for juvenile offenders categorically violated the Eighth

28

Amendment's prohibition on cruel and unusual punishment. *Miller v. Alabama*, 567 U.S. 460, 465 (2012). *Miller* advanced the principle that "children are constitutionally different from adults for purposes of sentencing." *Id*. at 471. But contrary to the government's argument on appeal, *Miller* is not limited to mandatory sentencing schemes. Although *Miller* focused on state statutory schemes that prescribed mandatory life sentences for juveniles, it recognized that "about 15% of all juvenile life-without-parole sentences [then being served]" were nonmandatory sentences imposed at the discretion of a judge or jury. *Id.* at 483 n.10. Rather than include those sentences in the broader categorical ban, the Court concluded only "that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id*. at 489.[5]

---

[5] *Miller* listed some of the "hallmark features" of juvenile defendants, including: (1) a lack of maturity that leads to, among other things, "heedless risk-taking;" (2) a lack of "ability to extricate from horrific-crime producing settings;" (3) an incompetence of youth in dealing with law enforcement; and (4) a juvenile's potential for rehabilitation. *Id*. at 477–78. These "distinctive attributes of youth diminish the penological justification for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id*. at 472.

In 2016, after Delgado's sentencing, the Supreme Court issued *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), which provided additional guidance about the proper application of *Miller*. *Montgomery* explains that *Miller* has both substantive and procedural components. As a matter of substantive constitutional law, *Montgomery* describes the pre-*Miller* world as a place where "every juvenile convicted of a homicide offense could be sentenced to life without parole." *Id.* at 734. But, after *Miller*, the Court noted that "it will be the rare juvenile offender who can receive that same sentence." *Id. Montgomery* stresses that a life-without-parole sentence is permissible only for "the rarest of juvenile offenders"—specifically, "those whose crimes reflect permanent incorrigibility" and "irreparable corruption." *Id.*

*Montgomery* also discusses *Miller*'s "procedural component"—in that *Miller* requires the trial court "to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* A sentencing court's consideration of these factors, according to *Montgomery*, "gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at 735.

Since there is no parole in the federal system, Delgado's sentence is effectively the same as a life-without-parole sentence in state court systems. *See Romano v. Luther*, 816 F.2d 832, 837 (2d Cir. 1987) (noting that the Sentencing Reform Act of 1984 eliminated parole). And, under Supreme Court precedent, Delgado could be sentenced to life-without-parole as a juvenile only based on his participation in the MacDonald and Young murders under the RICO conspiracy count, and not on the narcotics conspiracy count alone. *See Graham v. Florida*, 560 U.S. 48, 75 (2010) (holding that life-without-parole sentences for juveniles convicted of nonhomicide offenses are unconstitutional).

While Delgado's sentence was not mandatory[6] and thus does not fall under the categorical ban of *Miller*, his sentence was nonetheless improper. The district court did not reference Delgado's age at all, much less grapple with it. Even though the district court noted that it considered all of the Section 3553(a)

---

[6] Unlike the other codefendants, Delgado was not charged with the murders pursuant to the Violent Crimes in Aid of Racketeering ("VCAR") statute. VCAR prohibits the commission of certain violent crimes "in violation of the laws of any State or the United States," including murder, "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). VCAR-murder carries a mandatory life sentence. 18 U.S.C. § 1959(a)(1).

factors, which includes age in one of its policy statements, *see* U.S.S.G. § 5H1.1, a mere passing reference to Section 3553(a) is not enough to satisfy *Miller*'s constitutional mandate that reaches beyond what is set out in the Sentencing Guidelines.

Delgado's sentencing hearing does not indicate that there was deliberate consideration of his character as a juvenile, a constitutionally distinct class of defendants. *Miller* requires the district court to undertake additional reflection on the special social, psychological, and biological factors attributable to youth, and such reflection is absent from Delgado's sentencing hearing transcript. To be sure, we have no doubt that Judge Arcara knew the ages of the defendants when he sentenced them, along with much else that commands the attention of a sentencing judge. The sentencing transcript here is thorough and thoughtful; but *Miller* requires a more specific consideration in this case; and on resentencing, the court will have an opportunity to consider subsequent events, which may or may not counsel a lesser sentence, but that may be of considerable impact given the five years intervening since the original sentencing.

Accordingly, we vacate and remand for resentencing. On remand, the district court must consider the mitigating factors of youth as required by *Miller*

32

before it can determine that the most severe sentence for juvenile defendants—

life imprisonment without the possibility of parole—is a proportionate sentence.

## CONCLUSION

For the foregoing reasons, we affirm Delgado's conviction but vacate and

remand for resentencing consistent with this opinion.